UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LESLIE MUGAVERO,

                                    Plaintiff,                **MEMORANDUM OPINION
                                                              AND ORDER**

                    -against-

ARMS ACRES, INC. and FREDERICK             03 Civ. 05724 (PGG)
HESSE, M.D.,

                                    Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

            In this action, Plaintiff Leslie Mugavero claims that Defendants retaliated

against her after she complained in late April 2002 that another employee, Omar

Gutierrez, was sexually harassing a co-worker, Marie McArdle.  Mugavero alleges that

Defendant Hesse, who supervised both her and Gutierrez, retaliated against her by, inter

alia, subjecting her work to undue scrutiny and causing a series of allegedly unfair

disciplinary actions to be taken against her, culminating in the termination of her

employment on October 25, 2002.  The Complaint asserts:

> (1)    a claim that Arms Acres retaliated against her in violation of Title VII and
>        the New York State Human Rights Law ("NYSHRL") for assisting
>        McArdle in bringing a sexual harassment complaint against Gutierrez
>        (Counts I, II and IV);
>
> (2)    a claim against Hesse for aiding and abetting in the retaliation against her
>        (Counts III and IV);
>
> (3)    a claim against Hesse and Arms Acres for intentional infliction of
>        emotional distress (Count V); and
>
> (4)    a prima facie tort claim against Hesse and Arms Acres based on Hesse's
>        filing of a complaint against Plaintiff with the New York State Office of
>        Professional Discipline (Count VI).

Defendants have moved for summary judgment on all of Mugavero's claims, arguing that their actions were justified by legitimate concerns about Mugavero's job performance.  Defendants also argue that even if they are not entitled to summary judgment, Mugavero should be precluded as a matter of law from seeking certain types of damages.  For the reasons stated below, Defendants' motion for summary judgment (Docket No. 31) is GRANTED IN PART and DENIED IN PART.

## DISCUSSION

Summary judgment is warranted only if the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

I.      **FACTS**[1]

Defendant Arms Acres is a substance abuse rehabilitation facility in Carmel, New York.  (Def. Rule 56.1 Stat. ¶ 1)  Defendant Hesse was Arms Acres' Medical Director during the time period relevant to this action.  (Id. ¶ 2)  Plaintiff is a certified Family Nurse Practitioner and worked at Arms Acres from mid-1995 until October 25, 2002, reporting to Hesse until at least July 25, 2002.[2]  (Id. ¶¶ 13-14, 25, 30; Def. Rule 56.1 Stat. ¶ 374; Pltf. Rule 56.1 Resp. ¶ 374)

A.      **Mugavero's Job Performance at Arms Acres Prior to April 2002**

Mugavero contends that her relationship with Hesse, her supervisor, deteriorated dramatically after she reported – in April 2002 – an incident in which another nurse had been sexually harassed by Omar Gutierrez, an Arms Acres doctor. Defendants have offered evidence demonstrating, however, that Mugavero's job performance had been the subject of numerous complaints from co-workers and patients prior to April 2002, and that Hesse's supervisor and Arms Acres' Executive Director,

―――――――――――――――――――

[1] Defendants submitted a Rule 56.1 Statement containing 393 paragraphs of purportedly undisputed material facts.  In response, Plaintiff submitted a Rule 56.1 Statement containing 653 paragraphs of purportedly contested material facts.  Neither side has demonstrated an understanding of what is a "material" fact.

 To the extent that this Court relies on facts drawn from Defendants' Rule 56.1 Statement, it has done so because Plaintiff has not controverted those facts with citations to admissible evidence.  Where Plaintiff disagrees with Defendants' characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  See Cifra, 252 F.3d at 216 (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[2] Mugavero contends that Hesse was her supervisor "up to sometime after July 25, 2002, the end of July on in[to] August 2002," at which time Clinical Director Joanne Elliott became Mugavero's "administrative supervisor."  (Pltf. Rule 56.1 Resp. ¶¶ 30, 33)

Patrice Wallace-Moore, had been pressuring Hesse to discipline Mugavero since late 2000.

Shortly after becoming Arms Acres' Executive Director (Def. Rule 56.1 Stat. ¶ 11), Wallace-Moore became concerned about Hesse's supervision of Mugavero, because Mugavero generated more complaints from "patients and staff than any other employee in the building." (Wallace-Moore Dep. 279:2-7, 279:23-25; see also Def. Rule 56.1 Stat. ¶ 127; Pltf. Rule 56.1 Resp. ¶ 127)  These complaints related generally to Mugavero's demeanor, which was sometimes seen as disrespectful or uncooperative. (See, e.g., Def. Rule 56.1 Stat. ¶¶ 121-26, 184; Pltf. Rule 56.1 Stat. ¶¶ 121-26; id. ¶ 184 (agreeing that in December 2001 or January 2002, Nurse Sally Terlizzi complained verbally to Hesse that Mugavero "was very negative and abusive on-call"); Def. Ex. Z at 353-56 (written complaints about Mugavero from a nurse and a patient)).

Staff also complained that "they didn't feel that they were getting anywhere" complaining to Hesse about Mugavero. (Wallace-Moore Dep. 279:14-18)  In December 2001, Wallace-Moore "started taking a much firmer stance in requiring . . . Hesse to do a better job of supervising Plaintiff." (Def. Rule 56.1 Stat. ¶ 169; Pltf. Rule 56.1 Resp. ¶ 169)  She informed Hesse that if she heard any more complaints about Mugavero, she would assume responsibility for supervising and disciplining her. (Wallace-Moore Dep. 279:18-21; see also Pltf. Rule 56.1 Resp. ¶ 127)  Wallace-Moore felt that she had to "fight" to get Hesse to supervise Mugavero appropriately, because Hesse relied on her to help him complete his work. (Wallace-Moore Dep. 431:5-12; Def. Rule 56.1 Stat. ¶ 195; Pltf. Rule 56.1 Resp. ¶ 195)

On April 11, 2002, Wallace-Moore and Hesse met for a supervisory meeting.  (Def. Rule 56.1 Stat. ¶ 195)  Wallace-Moore told Hesse that Mugavero's "work ha[d] been relatively good," but "her attitudes and behaviors towards other staff and patients have been questionable and require corrective action."  (Def. Ex. CC at 501; Def. Rule 56.1 Stat. ¶ 195; Pltf. Rule 56.1 Resp. ¶ 195; Wallace-Moore Dep. 156:9-11 ("I had asked [Hesse] . . . in the middle of April, that he take some corrective action towards . . . [Plaintiff's] behaviors")).

**B.**     **The Events of Late April 2002**

Despite Wallace-Moore's pressure on Hesse to discipline Mugavero, she contends that she had a "successful and friendly work relationship" with Hesse until approximately April 20, 2002.  (Pltf. Br. at 3)  Shortly after April 20, 2002, however, Mugavero alleges that two events took place that changed their relationship.

First, at some time between April 21 and April 23, 2002, Plaintiff informed Hesse that Marie McArdle, another Arms Acres nurse, "was going to report" Omar Gutierrez, the Director of Psychiatry, "for . . . sexual harassment."  (Mugavero Dep. 86:7-21, 355:6-10 (also testifying that the conversation occurred "on a Monday or Tuesday" after a co-worker's party on Saturday, April 20, 2002); see also Pltf. Rule 56.1 Stat. ¶¶ 372-73; Cmplt. Ex. A (August 15, 2002 Affidavit of Leslie Mugavero) ¶ 14 (stating that the conversation occurred on April 21)).  Gutierrez reported to Hesse.  (Pltf. Rule 56.1 Stat. ¶ 27)

Second, on April 24, 2002, Hesse and Mugavero argued about another nurse, Kim Quickel.  Quickel came into Plaintiff's office that afternoon to complain that she was being sent home.  Hesse had ordered Quickel to leave the building because he

5

believed that she was under the influence of some type of drug.  Plaintiff had worked

with Quickel that day and did not believe that she was impaired, however.  (Mugavero

Dep. 355:10-20, 356:10-15)  Hesse called Plaintiff and demanded that she tell Quickel to

leave her office; Mugavero responded that she could "have anybody in [her] office" that

she wanted.  (Id. 356:18-20)

       That evening, Plaintiff, Hesse and other employees attended a work-

related dinner where Plaintiff – who was on call – drank two martinis.  (Def. Rule 56.1

Stat. ¶ 207; Pltf. Rule 56.1 Resp. ¶ 207)  Later that evening, Nurse Peggy Hutcoe called

Hesse at home and complained about Mugavero's response to Hutcoe's request for on

call assistance, saying that Mugavero sounded intoxicated.  (Hesse Dep. 584:18-585:8;

Def. Rule 56.1 Stat. ¶ 209; Pltf. Rule 56.1 Resp. ¶ 209)

       Hesse then called Mugavero at her home, at approximately midnight, and

told her that Hutcoe had complained and that he was taking over the on call duties that

night.  (Hesse Dep. 586:24-587:4; see also Def. Rule 56.1 Stat. ¶ 209; Pltf. Rule 56.1

Resp. ¶ 209 (not controverting that Hutcoe complained about Plaintiff on April 24 or that

the complaint was the reason Hesse removed Plaintiff from on call duty))  Plaintiff asked

Hesse to tell her what had happened at the meeting with Quickel earlier that day, but

Hesse refused.[3]  (Def. Rule 56.1 Stat. ¶ 206; Pltf. Rule 56.1 Resp. ¶ 206)

---

[3]  As discussed below, Defendants assert that the reason Plaintiff was removed from her
on call duties on April 24 was because she had violated Arms Acres' policies by
consuming alcohol while on call.  However, Plaintiff has offered evidence that creates a
genuine factual dispute as to whether Arms Acres had prohibited its employees from
consuming alcohol while on call and, if so, whether that policy had previously been
enforced.  (See infra pp. 29-31)

The next morning, Hesse told Wallace-Moore about Mugavero's behavior and on call performance the previous evening.  (Def. Rule 56.1 Stat. ¶ 214; Pltf. Rule 56.1 Resp. ¶ 214; Wallace-Moore Dep. 362:9-24 (referring to the events of April 24 as "the straw that broke the camel's back"))  They decided to give Plaintiff a written warning, which Hesse drafted.  (Def. Rule 56.1 Stat. ¶ 215; Pltf. Rule 56.1 Resp. ¶ 215; Wallace-Moore Dep. 362:19-24)  Hesse completed the draft warning on April 30, 2002. (Def. Rule 56.1 Stat. ¶¶ 230-31; Def. Ex. DD)

The warning was not given to Plaintiff until May 3, 2002, however.  (Def. Rule 56.1 Stat. ¶¶ 246-47; Def. Ex. KK)  In the meantime, Mugavero had taken further steps to assist McArdle in making her sexual harassment complaint.  On May 1, 2002, Mugavero provided a notarized statement in support of McArdle's complaint.  (Def. Rule 56.1 Stat. ¶ 233; Pltf. Rule 56.1 Resp. ¶ 233)  Arms Acres Human Resources Director Beverly Berkowitz interviewed Plaintiff concerning her statement on May 3, 2002.  (Def. Rule 56.1 Stat. ¶ 241)

The April 30 draft and the May 3 final version of the written warning appear to be identical.  (Def. Ex. DD; Def. Ex. KK)  The warning is in the form of a memorandum from Hesse to Plaintiff and lists four performance problems:  (1) "[n]umerous patient and staff complaints regarding unprofessional behavior," including "negative presentation" and "act[ing] disrespectfully" to a staff member and patient on April 19, 2002; (2) "On-Call performance problems," including an April 13, 2002 incident in which nurses complained about Plaintiff having slurred speech and giving conflicting orders, and the April 24, 2002 incident in which Hutcoe complained about Plaintiff; (3) "[i]nterference with other employee's disciplinary processes," including

"discussing another employee's disciplinary process at the nurses' station" on January 29, 2002 and "interfer[ing] with another employee's [i.e., Quickel's] leaving the building" on April 24, 2002; and (4) "insubordination," including failing to provide patient care when directed to do so and demanding on April 24 that Hesse speak with her about Quickel. (Def. Ex. DD)

From May 3, 2002 onward, Hesse began to supervise Plaintiff more closely. (See, e.g., Def. Rule 56.1 Stat. ¶¶ 256, 259; Pltf. Rule 56.1 Stat. ¶¶ 256, 259; see also Pltf. Br. at 8-9)

### C.    The June 26, 2002 Suicidal Patient Incident

On June 26, 2002, during an admission assessment, Mugavero evaluated a patient as being suicidal. (Def. Rule 56.1 Stat. ¶ 284; Pltf. Rule 56.1 Resp. ¶ 284) She "immediately" informed the nursing supervisor, Cindy Lipton, that she had examined a patient who might be suicidal. (Mugavero Dep. 649:19-23; Def. Ex. OO at 2145 (written statement by Cindy Lipton stating that Mugavero informed Lipton while she was on her lunch break that a new patient "had verbalized suicidal ideation with plans while . . . [Mugavero] was doing his admission History and Physical")) Mugavero also told Lipton that she would tell Sofia Umali, the psychiatric nurse, that she was needed for an evaluation, because Mugavero was leaving for an off-site lunch that Umali was attending. (Mugavero Dep. 649:19-650:4) As discussed below, Mugavero was later disciplined for

allegedly not following Arms Acres' protocol and improperly abandoning a suicidal patient. [4]

### D.   The Second Written Warning

Defendants assert that by late July 2002, Hesse and Wallace-Moore had several additional concerns about Mugavero's performance, including her involvement in the suicidal patient incident on June 26.  (Def. Rule 56.1 Stat. ¶¶ 313-16; Pltf. Rule 56.1 Resp. ¶¶ 313-16)  Wallace-Moore and Hesse decided to issue Plaintiff a second written warning at this time.  (Def. Rule 56.1 Stat. ¶¶ 313, 315; Pltf. Rule 56.1 Resp. ¶¶ 313, 315)

This warning was largely drafted by Hesse on July 25, 2002, but was not given to Mugavero until August 6, 2002.  (Def. Rule 56.1 Stat. ¶¶ 314, 318; Pltf. Rule 56.1 Resp. ¶¶ 314, 318)  This warning raised further "professionalism performance" issues, including acting disrespectfully toward Hesse and failing to perform admission assessments in a timely manner on August 6, 2002.  (Def. Ex. RR at 1)  This warning also stated that Plaintiff had:  failed to perform adequate review or act on patient pregnancy test results on three occasions between May 21 and June 20, 2002; ordered incorrect medication or failed to report a medication allergy on three occasions between July 8 and July 18, 2002; and failed to follow appropriate procedure concerning the suicidal patient on June 26, 2002.  (Id. at 1-2)  This warning required Plaintiff to take specific corrective action, including "[s]atisfactory review of all laboratory tests with specific attention to

---

[4]  Mugavero, however, asserts that she did not improperly abandon the patient, and has offered evidence suggesting that her conduct was consistent with Arms Acres policy and practice.  (See infra pp. 35-36)

pregnancy results" and "[c]onscientious adherence to all psychiatric emergency policies and procedures."  (Id. at 2)

### E.   Hesse's Complaint to the Office of Professional Discipline

On July 25, 2002, Hesse sent a letter to the New York State Department of Education's Office of Professional Discipline ("OPD") requesting an investigation into Mugavero's professional competence.  (Def. Rule 56.1 Stat. ¶ 328; Def. Ex. SS)  In the letter, Hesse stated that he was "concerned that there appears to be an increasing pattern of errors [by Mugavero]," and described the incidents set forth in the July 2002 written warning, including Mugavero's handling of pregnancy test results and the suicidal patient, and her incorrect medication orders.  (Def. Ex. SS at 1-4)  Hesse also described three other incidents, including two inaccurate patient assessments and an episode in which Mugavero failed to order appropriate care for a diabetic patient.  (Id. at 1-2)  Hesse wrote that "[w]e have completed investigation and discipline with a written warning," but that Mugavero "has not accepted supervision, and has been negative in her responses." (Id. at 1)

Plaintiff learned of Hesse's complaint in late December 2002, when she received a letter from the OPD.  (Mugavero Aff. ¶ 6)  The OPD investigation ended in late August 2003 without any charges being filed against Plaintiff.  (Id. ¶ 11; Def. Rule 56.1 Stat. ¶ 333)

### F.   Hesse's August 6, 2002 "Firing" of Mugavero

On August 6, 2002, Hesse and Mugavero had an argument that ended with Hesse telling Mugavero that she was fired.  Mugavero's co-worker Michelle De Marco had asked Mugavero to perform a physical.  (DeMarco Dep. 121:19-21)  Mugavero said

that she "only had two hands" and could not do it immediately.  (Id. 121:20-122:13;

Mugavero Dep. 673:20-674:14)  Hesse then asked Mugavero to come into his office.

After she refused, Hesse told her that she was fired.  (DeMarco Dep. 121:20-122:13;

Mugavero Dep. 673:20-674:14)

> Mugavero then told Human Resources Director Berkowitz what Hesse had

said.  (Berkowitz Dep. 225:5-6; Mugavero Dep. 675:12-19)  Berkowitz spoke with Hesse

and Wallace-Moore about the incident, and then told Plaintiff that she was "certainly not

terminated," but that "yelling at her supervisor in the presence of staff and patients is

insubordinate and that she might be hearing about that."  (Berkowitz Dep. 225:7-15,

6:22-227:4)  Mugavero agreed at her deposition that she had not actually been fired on

August 6.  (Mugavero Dep. 675:12-19, 676:15-17)

> **G.**     **Mugavero's EEOC Complaint**

> On August 16, 2002, Mugavero filed an EEOC charge against Arms Acres

and Hesse alleging that Hesse had retaliated against her for submitting a written

statement in support of McArdle's harassment complaint against Gutierrez and for

"express[ing] . . . displeasure concerning the . . . firing of . . . Quickel," who (according to

Plaintiff) had also been harassed by Gutierrez.  (Pltf. Ex. 84 ¶ 3)  Arms Acres responded

to the charge on September 20, 2002.  (Pltf. Ex. 23)

> **H.**     **The Termination of Mugavero's Employment**

> On October 1, 2002, Berkowitz began investigating new allegations that

Plaintiff had made errors with respect to a pregnant patient.  (Def. Rule 56.1 Stat. ¶ 352;

Pltf. Rule 56.1 Resp. ¶ 352; Berkowitz Dep. 175:3-11)  Hesse had brought the allegations

to the attention of JoAnne Elliott, who was then acting as Plaintiff's administrative

supervisor, and Elliott brought them to Berkowitz's attention.  (Berkowitz Dep. 170:8-173: 12)  Plaintiff was placed on administrative leave, beginning October 1, 2002, while the investigation was pending.  (Def. Rule 56.1 Stat. ¶ 353; Pltf. Rule 56.1 Resp. ¶ 353; Berkowitz Dep. 175:3-11)

    As part of her investigation, Berkowitz asked Hesse to explain the protocol for responding to a positive pregnancy test result.  (Def. Rule 56.1 Stat. ¶¶ 354-55; Pltf. Rule 56.1 Resp. ¶¶ 354-55; Berkowitz Dep. 177:9-17)  Hesse told Berkowitz that the person who signed off on positive pregnancy test results was responsible for issuing an order to stop the patient's withdrawal medication; ordering a blood pregnancy test; informing the patient and the patient's case manager; and documenting this in the patient's chart.[5]  (Def. Rule 56.1 Stat. ¶¶ 354-55; Pltf. Rule 56.1 Resp. ¶¶ 354-55; Berkowitz Dep. 208:12-14)

    On October 9, 2002, Mugavero met with Berkowitz and Elliott.  (Def. Rule 56.1 Stat. ¶¶ 360-61; Pltf. Rule 56.1 Resp. ¶¶ 360-61)  Mugavero asked to see the pregnant patient's medical chart so that she could better respond to questions about her treatment of the patient.  (Def. Rule 56.1 Stat. ¶ 361; Pltf. Rule 56.1 Resp. ¶ 361) Berkowitz provided Mugavero with excerpts from the patient's medical chart on October 22, 2002.  (Def. Rule 56.1 Stat. ¶ 365; Pltf. Rule 56.1 Resp. ¶ 365)  During this meeting, Mugavero acknowledged that she had signed off on the patient's positive pregnancy test results and had later re-ordered the patient's opiate withdrawal medication.  (Berkowitz

---

[5] Plaintiff asserts that Hesse did not accurately describe the regular practices followed at Arms Acres and she has offered evidence that creates a genuine factual dispute with respect to this issue.  (See infra pp. 39-40)  For instance, Plaintiff has offered evidence that the regular practice was typically for the nurse practitioner who admitted the patient to handle the follow-up, regardless of who first received the pregnancy test results.

Dep. 204:2-6, 205:7-12; Def. Ex. DDD (cited by Plaintiff as "D-Ex#8"))  She also noted that it appeared that another nurse practitioner, Joanne Callahan, had admitted the patient and ordered the pregnancy test.  (Berkowitz Dep. 208:22-25; Def. Ex. DDD)

        Berkowitz discussed the results of the investigation with Wallace-Moore, and Wallace-Moore decided to terminate Mugavero's employment.  Hesse was not involved in the decision.  (Def. Rule 56.1 Stat. ¶¶ 368-70)  An internal memo by Berkowitz, dated October 25, 2002, states that Mugavero's employment would "be terminated due to serious job performance errors which were committed after multiple written warnings."  (Def. Ex. XX)  The memo describes Mugavero's errors as "sign[ing] off on a lab report for a patient that indicated the patient had a positive pregnancy test result," but "(a) fail[ing] to interpret the lab report and discontinue medication for the patient . . .; (b) fail[ing] to enter the positive pregnancy results into the notes of the patient's chart; (c) fail[ing] to tell the patient that she had a positive pregnancy result; and (d) subsequently reorder[ing] withdrawal medications that are medically inappropriate for a pregnant person."  (Id.)  The memo also states that Mugavero "admitted that if she found a positive pregnancy test she would stop all medications and talk to the patient," but did not do so in this case.  (Id.)  It also states that "[a]t no point in the two meetings . . . did [Plaintiff] indicate that she told any other person that the patient was pregnant."  (Id.)

        On October 28, 2002, Berkowitz informed Mugavero that her employment had been terminated effective October 25, 2002.  (Def. Rule 56.1 Stat. ¶ 374)  Mugavero told Berkowitz at this meeting that she had told Callahan about the positive pregnancy test results.  (Def. Ex. YY at 492 (internal memo by Berkowitz stating that "[d]uring the

delivery of the termination paperwork for [Mugavero], [she] stated that she told Joanne

Callahan that the patient was pregnant.  I asked [Mugavero] if she documented her

conversation with Joanne.  [She] said no.")[6]

## II.  <u>MUGAVERO'S RETALIATION CLAIMS</u>

Courts evaluate Title VII retaliation claims using a three-step burden-

shifting analysis:

> First, the plaintiff must establish a <u>prima facie</u> case.  That is, an employee
> must show "(1) participation in a protected activity; (2) that the defendant
> knew of the protected activity; (3) an adverse employment action; and (4)
> a causal connection between the protected activity and the adverse
> employment action."  <u>McMenemy v. City of Rochester</u>, 241 F.3d 279,
> 282-83 (2d Cir. 2001).  The burden of proof that must be met to permit a
> Title VII plaintiff to survive a summary judgment motion at the prima
> facie stage has been characterized as "'minimal' and '<u>de minimis</u>.'"
> <u>Woodman v. WWOR-TV</u>, 411 F.3d 69, 76 (2d Cir. 2005) (quoting
> <u>Zimmermann v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir.
> 2001)).  In determining whether this initial burden is satisfied in a Title
> VII retaliation claim, the court's role in evaluating a summary judgment
> request is to determine only whether proffered admissible evidence would
> be sufficient to permit a rational finder of fact to infer a retaliatory motive.
> <u>See</u> <u>Donahue v. Windsor Locks Bd. of Fire Comm'rs</u>, 834 F.2d 54, 58 (2d
> Cir.1987).
>
> If a plaintiff sustains the initial burden, a presumption of retaliation arises.
> In turn, under the second step of the burden-shifting analysis, the onus
> falls on the employer to articulate a legitimate, non-retaliatory reason for
> the adverse employment action.  <u>See</u> [<u>Quinn v. Green Tree Credit Corp.</u>,
> 159 F.3d 759, 768 (2d Cir. 1998)].  Finally, as for the third step, once an
> employer offers such proof, the presumption of retaliation dissipates and
> the employee must show that retaliation was a substantial reason for the
> adverse employment action.

<u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005).[7]

---

[6]  Mugavero reiterated at her deposition that she believes she gave the pregnant patient's
lab reports to Joanne Callahan.  (Mugavero Dep. 455:22-25)

[7] The same standards apply to Plaintiff's retaliation claims against Arms Acres under
federal and state law.  <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 609 (2d Cir.

A plaintiff may show retaliatory intent with direct evidence "of retaliatory animus directed against the plaintiff" or with circumstantial evidence, including evidence that "the protected activity was followed closely by discriminatory treatment" or evidence of "disparate treatment of fellow employees who engaged in similar conduct." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (internal quotation omitted) (describing how a plaintiff may meet her burden at the third stage); see also McNair v. New York City Health & Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001) (listing same types of evidence as sufficient to establish fourth element of prima facie case). Further, at the third stage, "[u]nder some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action]." Raniola, 243 F.3d at 625.

Defendants argue that Plaintiff cannot establish a prima facie case of retaliation because there is no basis to infer a causal connection between the alleged adverse employment actions and her protected activity, and that even if she could demonstrate a causal connection, she would not be able to show that Defendants' stated legitimate reasons for taking those actions were a pretext for retaliation.  (Def. Br. at 1) However, as discussed below, this Court concludes that Plaintiff has offered sufficient evidence to meet her burden with respect to Hesse's request that the OPD investigate her in July 2002, and with respect to the discrete disciplinary actions that were taken against her between April 24 and October 25, 2002, including her termination.

---

2006) ("[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.").

A.      **Plaintiff's Prima Facie Case**

      1.      **Plaintiff's Protected Activity**

In considering whether Plaintiff has established a prima facie case of retaliation, the Court must first decide whether Plaintiff engaged in protected activity and, if so, whether that activity was known to Arms Acres. Defendants do not dispute that Plaintiff engaged in protected activity when she submitted a statement in support of McArdle's claim on May 1, 2002. (Def. Br. at 4) They also do not dispute that Plaintiff engaged in protected activity again when she filed an EEOC charge alleging retaliation on August 16, 2002 (Pltf. Ex. 84).[8]

However, the parties disagree as to whether Plaintiff also engaged in protected activity when she complained to Hesse about Gutierrez's conduct toward McArdle in late April 2002. Defendants argue that Plaintiff's report is not protected activity, because there is no evidence that Defendants could reasonably have understood Plaintiff to be complaining of a Title VII violation. (Def. Reply Br. at 1-2)

---

[8] Plaintiff clearly engaged in protected activity when she filed her EEOC charge, as Defendants implicitly acknowledge. See Linder v. Int'l Bus. Mach. Corp., No. 06-Civ.-4751(RJS), 2008 WL 2461934, at *7 n.9 (stating that plaintiff engaged in protected activity both when she filed an internal complaint and attempted to file an EEOC charge several months later); Charles v. City of New York, No. 99-Civ.-3786(RWS), 2007 WL 2728407, at *11 (S.D.N.Y. Sept. 17, 2007) (plaintiff "engaged in protected activity by complaining of discrimination internally" and by filing three EEOC charges during the same time period). Defendants, however, suggest that Plaintiff should not be allowed to assert the EEOC charge as protected activity because she did not plead this in the Complaint. (Def. Reply Br. at 3 & n.8) However, Defendants were clearly on notice that Plaintiff was asserting retaliation claims, including based on her termination (see Cmplt. ¶¶ 51-55, 72-74), and Defendants have not argued that they would be prejudiced if Mugavero were allowed to assert a retaliation claim based on the filing of her EEOC charge. Therefore, the Court will consider that retaliation claim. Cruz v. Coach Stores, Inc., 202 F.3d 560, 569 (2d Cir. 2000) (under Fed. R. Civ. P. 15(b), a court "may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice").

To find that a plaintiff engaged in protected activity and that the employer knew about that activity, a court must find that "the employer . . . understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). Drawing all rational inferences in Plaintiff's favor, the Court concludes that a jury could find in Plaintiff's favor on this issue.

Plaintiff has testified that at some time between April 21 and April 23, 2002, she told Hesse that Gutierrez "kissed [McArdle] on the mouth and it continued to escalate at [a subsequent] party" (Mugavero Dep. 387:11-14)[9]; that Gutierrez "is a letch and a sleaze bucket" (id. 386:7-21); and that McArdle was going to report Gutierrez for sexual harassment. (Id. 355:6-10). (See also supra p. 5)

Based on this evidence, a jury could reasonably find that Plaintiff complained to Hesse that Gutierrez had behaved in an inappropriate sexual manner toward McArdle and that McArdle found this conduct sufficiently unwelcome that she planned to report it. Accordingly, a jury could also conclude that Hesse should "reasonably have understood" that Mugavero's complaint about Gutierrez "was directed at conduct prohibited by Title VII," Galdieri-Ambrosini, 136 F.3d at 292 – i.e., illegal sexual harassment. See, e.g., Amodio v. Wild Oats Markets, Inc., No. 05-Civ.-714, 2006 WL 2800903, at **4-5 (D. Conn. Sep. 28, 2006) (employee engaged in protected activity

---

[9] Defendants argues that Plaintiff's testimony contradicts her sworn testimony in a suit brought by McArdle. (Def. Br. at 2 & n.6 (citing Mugavero Dep. (in McArdle action) 40, 107-110 and Def. McArdle Rule 56.1 Stat. ¶¶ 200-01)) However, the cited portions of Plaintiff's testimony from the McArdle case are not inconsistent with her testimony in this case. While Defendants cite Berkowitz's testimony concerning what Mugavero told her, this proof at most creates a genuine issue of material fact as to what Plaintiff told Hesse.

when she told store manager about another manager's sexual conduct and also told him

that other employees "might come to him to talk about" the manager's "inappropriate

conduct," even though she did not "literally" say that the manager "was sexually

harassing other employees").

Thus, Mugavero has established the first two elements of her prima facie

retaliation case in that she engaged in protected activity, which Defendants knew about,

at some point between April 21 and April 23, 2002; on May 1, 2002; and on August 16,

2002.

### 2.     Whether the Alleged Acts Constitute Adverse Employment Actions

To establish a prima facie case of retaliation, Mugavero must also show

that she was subjected to an adverse employment action.  In the context of a retaliation

claim, an adverse employment action is one that "well might have 'dissuaded a

reasonable worker from making or supporting a charge of discrimination.'"  Burlington

N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006).  "[P]etty slights, minor

annoyances, and simple lack of good manners" will not normally constitute adverse

employment actions for purposes of a retaliation claim.  Id.  A plaintiff must show

"material adversity," because "it is important to separate significant from trivial harms."

Id. (emphasis in original).

### a.     Alleged Retaliatory Harassment

In her brief opposing summary judgment, Mugavero asserts that she was

subjected to "retaliatory hostility . . . [and] criticism," closer scrutiny of her work

performance, and a change in her day off.  (Pltf. Br. at 3, 5; Cmplt. ¶ 48)  However, she

has not offered sufficient evidence to establish that the complained-of conduct qualifies as an adverse employment action.

As to the alleged retaliatory hostility, criticism, and closer scrutiny of her work performance (Pltf. Br. at 3, 5 (citing Pltf. Rule 56.1 Stat. ¶¶ 377, 443-75, 506, and 563-64)), Mugavero states only that Hesse was reviewing her medical charts more closely and that she found this stressful.[10]  Mugavero also cites JoAnne Elliott's testimony, but that evidence actually undermines Mugavero's argument that she was singled out for more intensive chart review:  Elliott testified that when Mugavero complained to her about the chart review, Elliott responded that "the entire Arms Acres . . . [was] trying to get better at doing chart audits before we had regulatory agencies come in," and that she believed that all charts were being audited.  (Elliott Dep. 53:22-54:19)

Mugavero's evidence is not sufficient to show that Hesse's review of her charts was anything other than legitimate supervision.  Mugavero has likewise not offered any evidence that she suffered any direct negative consequences from this supervision.  The only negative consequence she has identified is that the close supervision caused her stress.  But this is not sufficient to constitute an adverse

_____

[10]  In the paragraphs of Plaintiff's Rule 56.1 Statement that are cited in her memorandum of law with respect to this issue, Plaintiff cites her deposition (pp. 320-23, 406-07, 424-35, 446-48, 676-77, 729-31) and JoAnne Elliott's deposition (pp. 52-56).  The relevant evidence from these citations is extremely limited.  (See Mugavero Dep. 322:7-10 ("This was at a time when I was being harassed on a daily basis, from April on.  I was lucky if knew [sic] how to write my name, after this experience."; id. 448:8-11 (agreeing that "at some point in time, Dr. Hesse was reviewing . . . [her] charts before . . . [she] had a chance to proofread them"); id. 730:2-6 (on September 21, 2002 she "had a discussion with JoAnne Elliot and I can't remember what the particulars of it were, but it had to do with Dr. Hesse.  It got me so extremely upset I just – my blood pressure was off the wall"); Elliott Dep. 53:15-28 (agreeing that plaintiff told her she "feels she is being harassed by Dr. Hesse over chart audits")).

Case 1:03-cv-05724-PGG   Document 49   Filed 03/31/09   Page 20 of 55

employment action.  See, e.g., Stoddard v. Eastman Kodak Co., 2009 WL 367553, at *3

(2d Cir. Feb. 13, 2009) (stating it was "very unlikely" that plaintiff could show that

complaint of having been "subjected to closer scrutiny" was adverse employment action

for purpose of establishing prima facie case of retaliation); Lucenti v. Potter, 432 F. Supp.

2d 347, 364 (S.D.N.Y. 2006) (without more, "[r]eprimands, threats of disciplinary action

and excessive scrutiny do not constitute adverse employment actions" for purposes of

retaliation claim); Scafidi v. Baldwin Union Free Sch. Dist., 295 F. Supp. 2d 235, 239

(E.D.N.Y. 2003) ("While close monitoring may cause an employee embarrassment or

anxiety, such intangible consequences are not materially adverse alterations of

employment conditions. . . . To qualify as an adverse employment action, excessive

scrutiny must be accompanied by unfavorable consequences." (internal quotation

omitted)).

        Similarly, there is no basis to find that the change in Plaintiff's day off

was an adverse employment action.  Whether a change in schedule constitutes an adverse

employment action depends on context.  White, 548 U.S. at 69 (explaining that "[a]

schedule change . . . may make little difference to many workers, but may matter

enormously to a young mother with school age children").  Here, Plaintiff has not offered

evidence that the schedule change caused her anything more than inconvenience.[11]

_____

[11]  In support of this claim, Plaintiff cites paragraphs 436-442 of her Rule 56.1 Statement.
(Pltf. Br. at 8)  These paragraphs only purport to establish that Hesse changed Plaintiff's
schedule, and do not discuss any negative consequences of the schedule change.  Plaintiff
does assert elsewhere in her Rule 56.1 Statement that her health conditions "made it
difficult for [her] to work five consecutive days," as required by the new schedule.  (Pltf.
Rule 56.1 Stat. ¶¶ 440-41, 465-66)  However, the cited excerpts of her deposition
testimony do not remotely support this assertion; Plaintiff merely testified that she

20

Moreover, she concedes that the change in schedule did not affect her compensation or her ability to perform her job.  (Mugavero Dep. 539:4-7, 541:7-16)  Therefore, no reasonable jury could find that the schedule change was an adverse employment action.  See Ludwig v. Rochester Psychiatric Ctr., 550 F. Supp. 2d 394, 399 (W.D.N.Y. 2008) (change in day off, without any other negative consequence, was not adverse employment action for purpose of retaliation claim).

<b>b.      Alleged Retaliatory Discipline and Termination</b>

Plaintiff also asserts that she was subjected to the following retaliatory discipline and removal of responsibilities:

- the removal of her on call duties on April 24, 2002 (Pltf. Br. at 8; Cmplt. ¶ 39);

- the May 3, 2002 written warning, which confirmed that she would no longer have on call duties (Pltf. Br. at 8; Cmplt. ¶¶ 44-46);

- the July 25, 2002 written warning (Pltf. Br. at 9; Cmplt. ¶ 48);

- Hesse's July 25, 2002 request that New York State's Office of Professional Discipline investigate Plaintiff (Pltf. Br. at 3; Cmplt. ¶ 58);

- Hesse's August 6, 2002 statement that Plaintiff was fired (Pltf. Br. at 3, 9; Cmplt. ¶ 49);

- being placed on administrative leave with pay on October 1, 2002 (Pltf. Br. at 9-10; Cmplt. ¶ 51); and

- having her employment terminated effective October 25, 2002 (Pltf. Br. at 3, 9-10; Cmplt. ¶ 57).

Defendants concede that all but the administrative leave could constitute an adverse employment action.  (Def. Reply Br. at 4 n.12)  As to the administrative leave, Defendants cite Joseph v. Leavitt, 465 F.3d 87 (2d Cir. 2006), in which the Second

---

"required" Thursdays off because she had always had that day off and would play golf and schedule doctor's appointments on that day.  (Mugavero Dep. 346:20-347:10)

Circuit held that being placed on administrative leave with pay in the discrimination context is not a "materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." Id. at 91. However, Defendants have not addressed whether Plaintiff was placed on administrative leave pursuant to the reasonable enforcement of its preexisting disciplinary policies. Therefore, this Court cannot rule as a matter of law that Plaintiff did not experience an adverse employment action when she was placed on administrative leave.

### 3. Whether Mugavero Can Show a Causal Connection Between the Adverse Employment Actions and Her Protected Activity

To establish a prima facie case of retaliation with respect to the remaining alleged adverse employment actions – the April 24 removal of on call duties, the May 3 written warning, the July 25 written warning and report to the OPD, the August 6 statement that Mugavero was fired, and the October 2002 administrative leave and termination of Mugavero's employment – Mugavero must offer some evidence from which a jury could infer a causal connection between the actions and her protected activity.

### a. The April 24 and May 3 Actions

The April 24 and May 3, 2002 adverse employment actions occurred within just a few days of Plaintiff reporting Gutierrez's alleged harassment of McArdle to Hesse and submitting a written statement to the Human Resources Department in support of McArdle's complaint.[12] (See supra pp. 5-7) Ordinarily, this temporal proximity

_____

[12] Defendants argue that these events cannot be found retaliatory because the April 24, 2002 event occurred before Plaintiff engaged in protected activity and the decision to

would be sufficient to establish the fourth element of Plaintiff's prima facie case.  See

Feingold v. City of New York, 366 F.3d 138, 157 (2d Cir. 2004) (holding that the

"requirement that . . . [the plaintiff] show a causal connection between his complaints and

his termination is satisfied by the temporal proximity between the two," which was two

weeks); Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (plaintiff

established fourth element of retaliation claim where adverse action occurred twelve days

after protected activity).

        Nonetheless, Defendants assert that timing is insufficient to establish

Plaintiff's prima facie case here because the April 24 and May 3 adverse employment

actions were part of a series of "gradual adverse employment actions [Plaintiff]

experienced" beginning as early as August 1998.  (Def. Br. at 5)  In support of their

argument, Defendants cite Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87 (2d Cir.

2001), in which the Second Circuit held that "[w]here timing is the only basis for a claim

of retaliation, and gradual adverse job actions began well before the plaintiff had ever

engaged in any protected activity, an inference of retaliation does not arise."  Id. at 95

(emphasis added) (holding that plaintiff had not established a prima facie case).  In

Slattery, the Court found that there could be no inference of retaliation because alleged

adverse employment actions "were both part, and the ultimate product, of 'an extensive

period of progressive discipline,'" all relating to the same performance deficiency,

"which began when . . . [the defendant] diminished . . . [the plaintiff's] job

---

give Plaintiff the May 3 warning was made on April 25, 2002, also allegedly before
Plaintiff engaged in protected activity.  (Def. Br. at 11)  This Court has found, however,
that Mugavero has offered sufficient evidence for a jury to find that she engaged in
protected activity sometime between April 21 and April 23, 2002.  Accordingly, this
argument has no merit.

responsibilities a full <u>five months prior</u> to his filing of the EEOC charges."  <u>Id.</u> at 89-90,
95 (emphasis in original).

        In this case, the undisputed evidence concerning Mugavero's discipline
record prior to April 2002 is that she had been counseled by Hesse about her demeanor
and treatment of staff and patients on the following occasions:  (1) on or about September
30, 1998, Mugavero was given a verbal warning, later confirmed in a written
memorandum, concerning complaints from patients and staff about her unprofessional
demeanor; (2) on or about January 29, 1999, Mugavero had a formal counseling session
with Hesse after three other patients complained about her; and (3) Mugavero's July 1999
performance review listed "no patient complaints" as a recommended improvement,
which she acknowledged on September 1, 1999.  (Def. Rule 56.1 Stat. ¶¶ 92, 102, 108;
Pltf. Rule 56.1 Resp. ¶¶ 92, 102, 108; Def. Ex. X at 216)  However, Defendants have not
offered undisputed evidence that Mugavero received other warnings or formal counseling
between September 1, 1999 and April 2002.  To the contrary, there is undisputed
evidence that Hesse was criticized by his supervisor in October 2001 for failing to
address complaints allegedly made about Plaintiff.  (Def. Rule 56.1 Stat. ¶ 154; Pltf. Rule
56.1 Resp. ¶ 154)

        Thus, in this case, unlike in <u>Slattery</u>, there is no undisputed evidence of a
continuous progression of discipline over a short period of time.  Defendants have offered
evidence only of sporadic warnings and counseling concerning Plaintiff's demeanor over
a period of years, none of which had any substantial negative consequences for Plaintiff.
Further, the only issue addressed in the pre-2002 counseling was Plaintiff's demeanor
and the fact that staff and patients complained about her.  While the April 24 and May 3

24

adverse actions were based in part on continued complaints about Plaintiff's demeanor, Defendants assert that they were also based on other performance issues, including Plaintiff's consumption of alcohol while on call and her perceived insubordination.  (See supra pp. 6-8; infra p. 29; Def. Br. at 10, 12)

Therefore, the Court cannot conclude that any reasonable jury would find that the adverse actions Plaintiff experienced on April 24 and May 3, 2002 were part of a course of progressive discipline that started well before Plaintiff engaged in any protected activity.  Plaintiff has established a prima facie case of retaliation with respect to those actions.

### b.      The July 25, August 6 and October 2002 Actions

There is a longer gap between Plaintiff's protected activity and the later adverse actions.  The late July and early August actions occurred approximately three months after Plaintiff assisted McArdle in bringing her sexual harassment complaint against Gutierrez, and Plaintiff's employment was terminated five to nine weeks after she filed her EEOC charge.[13]  The three month gap is on the borderline of what courts in this Circuit have typically found sufficient to establish a plaintiff's prima facie case. Compare Burkybile v. Bd. of Educ. of the Hastings-on-Hudson Union Free Sch. Dist., 411 F.3d 306, 314 (2d Cir. 2005) (stating that this Circuit "has not established a specific delay between protected activity and adverse employment action that defeats an inference

---

[13]  The parties have not offered direct evidence showing when Defendants learned that Plaintiff had filed her EEOC charge, but a jury could reasonably infer that it was sometime between August 16, 2002, when she filed the charge, and September 20, 2002, when Defendants responded to the charge (DX 84).  Thus, a jury could reasonably infer that Defendants learned of the charge two to six weeks before they placed Plaintiff on administrative leave on October 1, 2002, and five to nine weeks before they decided to terminate her employment on October 25, 2002.

of causation" and noting that an inference of retaliatory intent has been found in cases involving a gap of as long as eight months), with Harrison v. North Shore Univ. Hosp., No. 04-Civ.-2033(WDW), 2008 WL 656674, at *12 (E.D.N.Y. March 6, 2008) ("[C]ase law indicates that a gap of up to one to two months between the protected activity and the adverse action may establish the requisite causal connection," while "[l]onger gaps . . . have been found to be too attenuated to establish a causal connection."); Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."); Nicastro v. Runyon, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation."); Ponticelli v. Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half month gap too long to give rise to inference of causal connection).

Here, however, Plaintiff does not rely solely on evidence of timing to show that Defendants' acts were retaliatory.  Mugavero has offered evidence from which a jury could infer that Hesse and Wallace-Moore mischaracterized her conduct or Arms Acres' policies in order to justify their adverse actions against her.  (See infra pp. 34-40) Moreover, a jury could rationally conclude that the later adverse actions were not completely isolated from the earlier adverse actions, but rather were part of a continuous chain of events, culminating in Plaintiff's termination, that began almost immediately after she engaged in protected activity.  Under these circumstances, Plaintiff has offered sufficient evidence to meet her "de minimis" burden of establishing a prima facie case of

retaliation.[14]  Jute, 420 F.3d at 173; see also Holcomb v. Iona Coll., 521 F.3d 130, 137

(2d Cir. 2008) ("We have repeatedly expressed the need for caution about granting

summary judgment to an employer in a discrimination case where, as here, the merits

turn on a dispute as to the employer's intent."); Brown v. Henderson, 257 F.3d 246, 251

(2d Cir. 2001) ("In discrimination cases, the inquiry into whether the plaintiff's sex (or

race, etc.) caused the conduct at issue often requires an assessment of individuals'

motivations and state of mind, matters that call for a 'sparing' use of the summary

judgment device because of juries' special advantages over judges in this area.").

### B.      Defendants' Proffered Reasons for Their Actions

Because Plaintiff has established a prima facie case, the burden shifts to

Defendants to "demonstrate that a legitimate, nondiscriminatory reason existed for . . .

[their] action[s]."  Raniola, 243 F.3d at 625.  With respect to each of the adverse actions

at issue here, Defendants have offered evidence that the reason for the action was a

deficiency in Plaintiff's performance.  (See Def. Br. at 8-16)  This is sufficient to meet

Defendants' burden.  See Auguste v. New York Presbyterian Med. Ctr., 593 F. Supp. 2d

659, 666 (S.D.N.Y. 2009) ("poor work performance has often been recognized as a

---

[14]  Defendants also argue that, under Slattery, the later adverse employment actions
cannot constitute retaliation because they were also part of continuous progressive
discipline.  (Def. Br. at 4-7)  This argument is even weaker with respect to the later
actions than it is with respect to the April and May 2002 actions, because the later actions
were based entirely on new performance issues, including Plaintiff's handling of
pregnancy tests and the suicidal patient.  (See supra pp. 9-14)  Defendants have not
offered evidence that they raised concerns about such issues prior to April 2002, when
Mugavero first engaged in protected activity.  To the contrary, they have offered
evidence that Plaintiff's supervisors had not previously been concerned about this aspect
of her performance.  For example, Wallace-Moore's July 2, 2002 notes concerning her
own supervision of Hesse state that Mugavero "has . . . been found to have many
mistakes on her work.  Such has never been noticed due to [Hesse]'s admittedly sporadic
if any supervision of [Mugavero]'s work."  (Def. Ex. CC at 8 (emphasis added))

legitimate, non-discriminatory reason for termination" in retaliation cases); <u>Weber v. Parfums Givenchy, Inc.</u>, 49 F. Supp. 2d 343, 357 (S.D.N.Y. 1999) (employer's explanation that employee had a "poor attitude" and did not work well with co-workers was "sufficient to meet its burden" of articulating a legitimate non-discriminatory reason for adverse employment action).

### C.    <u>Plaintiff's Showing of Retaliatory Intent</u>

Because Defendants have produced legitimate, non-retaliatory reasons for their actions, "the presumption of retaliation dissipates," and Mugavero must offer evidence from which a jury could find "that retaliation was a substantial reason for the adverse employment action." <u>Jute</u>, 420 F.3d at 173.  To meet her burden, Plaintiff relies on the timing of the adverse actions and on evidence that Defendants' stated reasons for the adverse actions are based on Hesse's mischaracterization of her conduct or of Arms Acres' policies and procedures (Pltf. Br. at 7-17).  The Second Circuit has recognized that "under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action]." <u>Raniola</u>, 243 F.3d at 625.  Moreover, summary judgment may be improper where there is evidence that the defendant's proffered reasons are partially pretextual.  <u>See, e.g.</u>, <u>Ebanks v. The Neiman Marcus Group, Inc.</u>, 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006) (summary judgment inappropriate because there were genuine factual disputes as to whether employer's reasons for the adverse employment actions "were in part pretextual"); <u>Rooney v. Capital Dist. Transp. Auth.</u>, 109 F. Supp. 2d 86, 98-99 (N.D.N.Y. 2000) (summary judgment inappropriate

because there was "a sufficient basis for a trier of fact to conclude . . . that the reasons

defendant offered for plaintiff's dismissal were at least partially pretextual").

As discussed below, there is sufficient evidence for a reasonable jury to

find in Mugavero's favor with respect to all of the adverse actions except Hesse's August

6 "firing" of her.

        1.       **<u>Evidence of Pretext</u>**

           a.       **<u>The April 24 Adverse Action</u>**

In their brief, Defendants state that Hesse removed Mugavero from her on

call duties on April 24 because she had consumed alcohol while on call, thereby

"ignor[ing] Arms Acres' Code of Ethics."  (Def. Br. at 10)  Hesse had received a

complaint about her on call performance and believed that Mugavero was under the

influence of alcohol.  Plaintiff has offered evidence, however, indicating that Defendants'

stated reasons for their actions are untrue insofar as they are based on Mugavero's mere

consumption of alcohol while on call.  (Pltf. Br. at 8)

First, a jury could reasonably find that as of April 24, 2002, Arms Acres

had not clearly prohibited employees who were on call from consuming alcohol.  On

April 25, 2002 – one day after the April 24 incident – Hesse issued a memorandum to

staff concerning the consumption of alcohol while on call.  (Def. Rule 56.1 Stat. ¶ 211;

Pltf. Rule 56.1 Resp. ¶ 211)  The memo states:  "In order to clarify any confusion

regarding On Call procedures and consistent with Arms Acres policy, consumption of

any alcohol or illegal substances while on call is unacceptable and will not be tolerated

under any circumstances."[15]  (Def. Ex. BB at 9)  Plaintiff has testified that she had not

previously been aware of any policy that prohibited staff members from drinking alcohol

while they were off premises, and before Hesse issued the April 25 memo, no one had

told her that she could not have a drink while on call.  (Mugavero Dep. 328:7-12, 329:2-

8)  After Hesse issued the memo, Mugavero asked the Executive Director and Director of

Human Resources for a copy of Arms Acres' on call policy; Mugavero testified that

"[n]obody could provide me with the On-Call policy.  No one."  (Id. 329:11-18)  In sum,

a jury could infer from Plaintiff's testimony and Hesse's memo that Arms Acres' policy

was unclear before April 25, 2002.

   Second, Plaintiff has offered evidence showing that prior to April 25,

Arms Acres would not typically have disciplined an employee solely for consuming

alcohol while on call.[16]  Hesse himself agreed at his deposition that he had consumed

alcohol while on call on approximately half a dozen occasions.[17]  (Hesse Dep. 355:5-7,

355:22-356:5)  Mugavero has also offered testimony from a co-worker, Steven

Herzenberg, that he, Hesse and Plaintiff "would go out eating and drinking together after

work and one of us would be on-call."  (Herzenberg Aff. ¶ 16)  Herzenberg further

testified that he had "seen . . . Hesse drink while he was on-call" and that he had been

---

[15]  The Code of Ethics provides that employees shall "not provide services while under
the influence of alcohol and/or other substances," but does not directly address the on call
context.  (Def. Ex. N at 574)

[16]  While working at Arms Acres, Mugavero was on call up to seven days a week.  She
drank a glass of wine or a martini with her dinner approximately three or four times a
week, including when she was on call.  (Mugavero Dep. 326:5-12, 326:16-327:4)

[17]  Mugavero recalled an incident in which she "had to take [a] call for" Hesse "because
he was under the influence of alcohol and he had to sleep at my house."  (Id. 328:13-18)
Hesse agreed that he had too much to drink one night at a party at Plaintiff's house, but
could not recall whether he was on call that night.  (Hesse Dep. 363:9-364:14)

with Hesse and Mugavero "when [Mugavero] was drinking while on-call, and . . . Hesse never said anything on any of those occasions."[18]  (Id.)

Therefore, to the extent Defendants argue that Hesse's removal of Mugavero from her on call duties was justified by her mere consumption of alcohol while on call, a jury could conclude that this reason for their action is pretextual.

### b.      The May 3 Written Warning

Defendants have stated that they issued the May 3 written warning because they had received "numerous patient and staff complaint's about Plaintiff's lack of professionalism and abusive demeanor" and Plaintiff had previously been "counseled, both verbally and in writing, to correct these . . . deficiencies."  (Def. Br. at 12)  The warning itself states that it was issued for four reasons:  (1) the patient and staff complaints; (2) on call performance problems; (3) "[i]nterference with other employee's disciplinary processes"; and (4) "insubordination."

Defendants do not rely on Plaintiff's consumption of alcohol to justify the May 3 warning, and have offered substantial evidence showing that certain of the performance problems referred to in the May 3 warning were longstanding.  For instance, there is undisputed evidence that Defendants had received several prior complaints, including about Plaintiff's on call performance, and that Hesse received another complaint on April 24, 2002.  (See supra pp. 4-6)  Defendants have also offered undisputed evidence that as a result of the earlier complaints, Wallace-Moore had asked

_____

[18]  Indeed, Hesse was at dinner with Mugavero on April 24, 2002, when she drank the two martinis.  While Hesse contends that he did not notice Mugavero's consumption of alcohol that evening (Hesse Dep. 588:23-589:5), a jury could find that he intentionally failed to challenge her drinking while on call, consistent with his own behavior and previous acceptance of Mugavero's drinking on call.

Hesse to supervise Mugavero more closely since at least December 2001 and reiterated on April 11, 2002 that he needed to take corrective action concerning her.  (See id.) Moreover, Mugavero's conduct with respect to Quickel – rejecting Hesse's instruction to tell Quickel to leave her office and demanding later that Hesse disclose the substance of his meeting with Quickel – is also undisputed (see supra pp. 5-6), and Plaintiff makes no effort to justify this behavior.

However, not all of the issues listed in the May 3 written warning (e.g., insubordination and interfering with another employee's discipline) had been identified by Defendants as longstanding performance problems.  Moreover, in light of undisputed evidence that Hesse had resisted disciplining Plaintiff with respect to her demeanor and on call performance for years – despite pressure from Wallace-Moore –a jury could rationally conclude that Plaintiff's prior performance problems and the events of April 24 presented an excuse to discipline Plaintiff, but were not the sole reason Hesse issued the May 3 written warning.  Given the proximity between the May 3 written warning and Plaintiff's protected activity, the Court cannot conclude as a matter of law that no reasonable jury could find that Hesse was motivated in substantial part by retaliatory intent.  See Holcomb, 521 F.3d at 137 (expressing the "need for caution about granting summary judgment to an employer . . . where . . . the merits turn on a dispute as to the employer's intent"); Brown, 257 F.3d at 251 (noting "juries' special advantages over judges in th[e] area" of "assess[ing] . . . individuals' motivations and state of mind").

c.      **Hesse's August 6, 2002 "Firing" of Mugavero**

Neither party directly addresses the reason that Hesse told Plaintiff she was fired on August 6, 2002 or whether that reason was a pretext for retaliation.  Viewing the evidence most favorably to Plaintiff, it appears that on August 6, 2002, Mugavero

32

was asked to perform a physical and stated that she could not immediately do so, because she "only ha[d] two hands"; that Hesse then yelled at her and instructed her to come into his office; that Mugavero refused; that Hesse told her that if she refused, she was fired; and that Mugavero then reported this to Berkowitz, who told her that she was not fired. (See supra pp. 10-11)

Based on these facts, it appears that Hesse believed that Mugavero was being insubordinate.  Mugavero has not offered any evidence that she was not insubordinate or that her insubordination was not the true reason Hesse told her that she was fired.  Courts have held that where, as here, the only evidence of retaliatory intent is a three-month gap between the protected activity and the alleged adverse action, and the defendant has offered a legitimate, non-retaliatory reason for the action, the defendant is entitled to summary judgment.  See Bain v. Wal-Mart Stores, Inc., 585 F. Supp. 2d 449, 454 (W.D.N.Y. 2008) (finding it "well-settled that temporal proximity alone is insufficient to overcome an employer's legitimate, nondiscriminatory reason for terminating a plaintiff's employment"); Murray v. Visiting Nurse Serv. of New York, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (at third stage, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action [without more] does not allow for an inference of causation"); see also Bonham v. Copper Cellar Corp., 476 F. Supp. 98, 103 (E.D. Tenn. 1979) (stating that where supervisor and plaintiff "exchanged . . . heated language" unrelated to plaintiff's protected activity, and supervisor "fired . . . [plaintiff] on the spot," the supervisor's action "could not reasonably be attributed to a calculated consideration of plaintiff's earlier complaints").

Therefore, Defendants are entitled to summary judgment with respect to any retaliation claim based on Hesse's August 6 statement that Plaintiff was fired.

### d. The July 25, 2002 Report to the OPD and the October 2002 Termination of Plaintiff's Employment

The parties offer similar arguments concerning the three remaining adverse employment actions:  Hesse's July 25, 2002 request that the New York State Office of Professional Discipline investigate Plaintiff; the July 25 written warning; and Arms Acres' decision to place Plaintiff on administrative leave on October 1, 2002 and terminate her employment on October 25, 2002.  In each case, Defendants assert that their actions were motivated by their legitimate concerns about Mugavero's performance and, more specifically, patient care errors that she had made.  (Def. Br. at 8-16)  To show that these reasons are pretextual, Mugavero offers evidence that Hesse mischaracterized her performance and/or Arms Acres' policies and protocols in order to justify the adverse actions.  (See Pltf. Br. at 8, 10, 12, 16)

### i. Hesse's July 25, 2002 Report to the OPD

Defendants assert that Hesse requested that the OPD investigate Plaintiff because he was concerned that she presented a safety risk to Arms Acres' patients.  (Def. Br. at 14)  In his letter to the OPD, Hesse states that his concerns are based on a variety of patient care errors that Plaintiff had allegedly made, including failing to take appropriate action concerning two positive pregnancy tests; inaccurately evaluating patients with respect to an EKG and a risk for seizures; making errors in ordering medication and ordering appropriate meals for diabetic patients; and, most significantly, inappropriately handling the suicidal patient in June 2002, including by abandoning or neglecting him. (Def. Ex. SS)  More than half of Hesse's letter is devoted to describing the June 2002

suicidal patient incident, which Hesse alleged "exemplifies potential abandonment and negligence for a patient requiring immediate care." (Def. Ex. SS at 437) Hesse also states that he is requesting investigation of Plaintiff's conduct in the suicidal patient incident because it appears to be "more negligent and serious" than the conduct of others involved, "potentially constituting abandonment or neglecting a patient in need of immediate care, based on her own assessment." (Id. at 438)

A jury could find, however, that Hesse mischaracterized the suicidal patient incident and Arms Acres' subsequent investigation, including in describing Plaintiff's conduct as "abandonment." (Id.) Both parties have offered evidence indicating that it was the "charge nurse" or nursing supervisor's responsibility to arrange for one-on-one supervision of a suicidal patient. Mugavero testified that under Arms Acres' policy, it was the responsibility of the nursing supervisor, Cindy Lipton, to arrange for one-on-one supervision of such a patient, and that she herself had never arranged such care for a psychiatric patient. (Mugavero Dep. 650:13-22, 651:3-12, 652:3-14) An Arms Acres psychiatric nurse corroborated Mugavero's testimony on this point. Umali Aff. ¶ 21 (testifying that "[a]ccording to Arms Acres policy and procedures it was . . . the responsibility of the nursing supervisor to set up a one-on-one sitter for" a suicidal patient "until the patient could be evaluated by a member of the psychiatric team"). Defendants cite a written policy for handling suicidal patients that is in accord with the above testimony, because it states that responsibility for "[c]onstant one to one observation" is "[a]ssigned by charge nurse & clinical director." (Def. Ex. OO at 2146) Lipton agreed at her deposition that this written policy was in effect at the time of the

incident in question and testified that she and Barbara Klein had the role of charge nurse when they were on duty.  (Lipton Dep. 23:19-25:6)

Moreover, the parties agree that Lipton was on duty that day and that Mugavero told Lipton about the suicidal patient before leaving for lunch.  (See supra p. 8)  In his letter to the OPD, however, Hesse states only that Plaintiff "mentioned in passing in the hallway to nursing staff that she examined a suicidal patient and that she was going to notify psychiatry to evaluate but did not give any orders or instructions." (Def. Ex. SS at 438)  Hesse does not explain that Mugavero had spoken to the nursing supervisor or that it was normally the nursing supervisor's responsibility to arrange for one-on-one supervision.  (Id.)  Based on this evidence, a reasonable jury could find that Plaintiff had acted in accordance with Arms Acres' procedures, but Hesse nonetheless attempted to make her conduct appear seriously deficient.

There is also evidence that calls into question Hesse's statement that Mugavero's conduct was "more . . . serious" (Def. Ex. SS) than that of others involved in the incident.  Defendants have offered evidence that Sofia Umali, like Mugavero, received a written warning for failing to arrange for one-on-one supervision of the patient and for failing to evaluate the patient promptly.  (Def. Ex. PP (warning dated June 28, 2002))[19]  Thus, a jury might conclude that Umali's conduct was as "serious" as Plaintiff's.

A jury could also find that Hesse's description of the status of the matter at Arms Acres as of July 25, 2002 was misleading and unfairly damaging to Mugavero.

---

[19]  It is undisputed that Plaintiff had told Cindy Lipton that she would tell Sofia Umali, the psychiatric nurse, that she was needed for an evaluation, because Plaintiff was going to an off-site lunch that Umali was at.  (Mugavero Dep. 649:19-650:4)

Hesse told the OPD, "[w]e have completed investigation and discipline with a written warning," but Plaintiff "has not accepted supervision, and has been negative in her responses." (Def. Ex. SS at 1) It is undisputed, however, that Plaintiff was not even given a written warning concerning the incidents listed in Hesse's OPD letter until early August 2002. (See supra p. 9) Accordingly, Hesse's assertion in the OPD letter that Mugavero had responded negatively to the written warning and discipline is false.

Because there is substantial evidence that Hesse, inter alia, omitted exculpatory information about the suicidal patient incident from his report to the OPD, exaggerated Mugavero's culpability vis a vis her colleagues, and misrepresented the status of the investigation at Arms Acres as well as Mugavero's alleged response to the not yet issued written warning and discipline, a jury could reasonably find that Defendants' stated reasons for Hesse asking the OPD to investigate Mugavero are pretextual.

### ii.       The July 25, 2002 Written Warning

The July 25, 2002 written warning is based on a number of purported deficiencies in Mugavero's performance, including the suicidal patient incident. (See supra pp. 9-10) Thus, a jury could find that it is at least in part pretextual because it is based on a mischaracterization of Plaintiff's conduct and the appropriate protocol with respect to suicidal patients. (See supra pp. 35-36)

### iii.      The October 2002 Investigation of Plaintiff's Treatment of a Pregnant Patient

Defendants' stated reason for placing Mugavero on administrative leave and later terminating her employment in October 2002 is that she had "failed to follow Arms Acres' protocol for documenting and responding to positive pregnancy results for

37

the fifth time."  (Def. Br. at 15 (citing Rule 56.1 Stat. ¶¶ 320, 346-51, 365-75))

Defendants assert that Wallace-Moore made the decision to terminate Mugavero's

employment based on:  (1) the results of an investigation conducted by Human Resources

Director Berkowitz and Clinical Director JoAnne Elliott, and (2) the fact that Mugavero

had received previous warnings concerning lab results for pregnant patients.  (Def. Br. at

15-16 (citing Def. Rule 56.1 Stat. ¶¶ 367-75))  In her memo explaining the decision to

terminate Mugavero's employment, Berkowitz states that Plaintiff "a) failed to interpret

the lab report and discontinue medication for the patient (which could be harmful to the

fetus); b) failed to enter the positive pregnancy results into the notes of the patient's

chart; c) failed to tell the patient that she had a positive pregnancy result; and d)

subsequently re-ordered withdrawal medications that are medically inappropriate for a

pregnant person."  (Def. Ex. XX)  The Berkowitz memo also notes that "[o]ne of the

specific corrective actions" in Plaintiff's July 25, 2002 written warning was

"[s]atisfactory review of all laboratory tests with specific attention to pregnancy results."

(Id.)

        Mugavero does not dispute that Wallace-Moore made the decision to

terminate her employment, nor does she dispute that Wallace-Moore did so because she

believed Mugavero had violated Arms Acres' protocol for treating pregnant patients

despite having received a prior written warning on that subject.  (See Pltf. Br. at 10-12;

see also Pltf. Rule 56.1 Stat. ¶ 577 (contending that Wallace-Moore "made the decision to

terminate [Plaintiff] based upon:  (1) the results of the investigation into the care of

patient RAJ, chart # 31919, which was based upon the protocols as told to the

investigators Berkowitz and Elliott, both clinicians, and to [Wallace-Moore] by . . . Hesse

and (2) based upon the prior written warnings issued to [Plaintiff] by . . . Hesse"))

Mugavero argues that Hesse substantially influenced the decision to investigate her and

terminate her employment, however, and that he misrepresented Arms Acres' protocols

concerning pregnant patients in order to bring about those decisions.

As with the suicidal patient incident, Mugavero has offered evidence from

which a jury could find that she did not violate Arms Acres' usual practices and

procedures in treating the pregnant patient.  For example, Mugavero has offered evidence

that creates a genuine factual dispute as to whether Hesse accurately described to

Berkowitz the normal procedure for handling positive pregnancy test results.  According

to Hesse, the person who receives the results is responsible for taking further steps.  (See

supra p. 12)  Mugavero testified, however, that she normally reviewed all new test results

each morning, and that her practice upon seeing a positive pregnancy test result was to

check the chart to determine who had seen the patient initially and ordered the test.

(Mugavero Dep. 453:5-18)  If Mugavero had not ordered the test and the employee who

had ordered it was scheduled to work that day, Mugavero would provide the test results

to that person.  (Id.)  Otherwise, Mugavero would follow up on the report herself.  (Id.)

In this instance, there is evidence that Joanne Callahan, another nurse practitioner, had

admitted the patient and ordered the test, and Mugavero testified that she told Callahan

that the patient was pregnant and provided the test results to her.  (See supra pp. 12-14 &

n.6)

Plaintiff has also offered evidence that it was the regular practice at Arms

Acres to extend a patient's opiate withdrawal protocol without first confirming that the

patient was not pregnant.  (Pltf. Br. at 10 (citing Pltf. Rule 56.1 Stat. ¶¶ 140-147 (citing

Mugavero Dep. 460-62 and Hesse Dep. 337-40, 715-17)))  Mugavero testified that she extended the protocol for the patient involved in the September 2002 incident at the request of a nurse without first reviewing the patient's chart, which was done "all the time."  (Mugavero Dep. 461:20-462:23)  Hesse likewise testified that he had extended opiate withdrawal protocols when he was on call without first reviewing the patient's chart or other information that would indicate whether the patient was pregnant.  (Hesse Dep. 716:14-717:11)

Therefore, Plaintiff has offered sufficient evidence for a jury to find that she had not violated Arms Acres' policies and protocols for responding to pregnant patients, and that Hesse mischaracterized those practices in order to create a pretextual reason for terminating her employment.

Defendants argue that they are nonetheless entitled to summary judgment because Wallace-Moore made the decision to terminate Mugavero, and Mugavero does not contend that Wallace-Moore had any retaliatory intent.  (Def. Br. at 6-8)  However, even where the ultimate decision maker has no unlawful intent, a plaintiff may still defeat summary judgment by showing that an individual who was motivated by unlawful intent played a "meaningful role" in the decision.  Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999) ("We recognize that the impermissible bias of a single individual at any stage of the . . . [decision making] process may taint the ultimate employment decision in violation of Title VII.  This is true even absent evidence of illegitimate bias on the part of the decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . [decision making] process.").

40

Here, it is undisputed that Wallace-Moore and Berkowitz relied on Hesse's explanations of Arms Acres' practices and protocols for treating pregnant patients in deciding to terminate Plaintiff's employment.  (See supra p. 12)  Therefore, contrary to Defendants' argument (Def. Reply Br. at 7), their investigation of Mugavero's conduct was not truly "independent" of Hesse's influence.  Because a jury could find that Hesse was motivated by retaliatory intent and that he played a meaningful role in the decision to terminate Plaintiff's employment, it would be improper to grant summary judgment based on the absence of evidence that Wallace-Moore had retaliatory intent. See Back v. Hastings-On-Hudson Union Free Sch. Dist., 365 F.3d 107, 126 (2d Cir. 2004) (holding that lack of bias on part of ultimate decision maker was not dispositive where decision to deny tenure was based on recommendation of biased individuals, whose "numerous accusations of poor performance . . . were overblown and pretextual"); see also Owens v. New York City Hous. Auth., 934 F.2d 405, 410 (2d Cir. 1991) (discriminatory comments by individuals who had "substantial influence over . . . [plaintiff's] employment" were sufficient to "raise a genuine issue of fact on the issue of pretextuality" with respect to defendant's stated reason for terminating plaintiff's employment).

## 2.      Whether Plaintiff Can Prevail On Her Retaliation Claims

Because Defendants have offered legitimate, non-retaliatory reasons for their adverse actions, they are entitled to summary judgment unless the Court concludes that Plaintiff has offered evidence from which a jury could find "that retaliation was a substantial reason for the . . . action[s]."  Jute, 420 F.3d at 173.  Plaintiff's evidence of retaliatory motive here is the timing of the actions and the evidence of pretext.  The

Second Circuit has held that "[u]nder some circumstances," such evidence is sufficient to defeat summary judgment.  Raniola, 243 F.3d at 625 ("[u]nder some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action]").  Courts have found that in the circumstances presented by this case – where the adverse actions began very close in time to the protected activity and there is evidence that the employer misstated its policies or the employee's performance to create a pretext for the adverse actions – the plaintiff should be allowed to proceed to trial on her retaliation claim.

For instance, in Tainsky v. Clarins USA, Inc., 363 F. Supp. 2d 578 (S.D.N.Y. 2005), the court denied summary judgment on a retaliation claim where (1) the termination occurred approximately a month after the plaintiff first complained of harassment and three days after the plaintiff complained again, and (2) there were "genuine issues of disputed fact concerning the bona fides of" defendant's explanation that the plaintiff was terminated due to her poor work performance, including an "above average" evaluation and a raise.  Id. at 582, 585.  Similarly, in Miller v. Nat'l Life Ins. Co., No. 07-Civ.-364, 2009 WL 347567 (D. Conn. Feb. 11, 2009), the court denied summary judgment on a retaliation claim where the adverse action occurred ten days after the plaintiff complained of discrimination and the plaintiff offered evidence that the employer "misstated his performance in order to create a pretext" for firing him.  Id. at *10 (noting that there was also evidence that a supervisor was angry about plaintiff's complaints).  See also Feingold, 366 F.3d at 157 (court erred in granting summary judgment to employer on retaliation claim where adverse action occurred two weeks after

protected activity and plaintiff offered sufficient evidence to show that employer's reason
for the action was pretextual).

       Here, as in <u>Miller</u> and <u>Tainsky</u>, the first adverse action occurred only
several days after Plaintiff's first protected activity (<u>i.e.</u>, reporting Gutierrez's sexual
harassment of McArdle to Hesse).  Although there was a larger gap in time between
Plaintiff's protected activity and the July and October 2002 adverse actions, the gap is not
so great as to undermine any inference of retaliatory intent, particularly because a jury
could rationally conclude that just days after Plaintiff first engaged in protected activity,
Hesse went out of his way to see that Plaintiff was disciplined, in stark contrast to years
of prior behavior in which – according to Wallace-Moore – he hardly supervised her at
all.  (Def. Ex. CC at 8)

       Moreover, as in <u>Miller</u> and <u>Tainsky</u>, Plaintiff has offered evidence from
which a reasonable jury could find that Hesse misrepresented her conduct and Arms
Acres' policies and procedures – or at least unfairly portrayed Plaintiff's conduct as more
egregious than was warranted – in order to bring about the adverse actions.  Therefore,
Defendants are not entitled to summary judgment with respect to the April 24, May 3,
July 25 and October 2002 adverse actions.  <u>See also</u> <u>Levitant v. City of New York
Human Res. Admin.</u>, No. 05-Civ.-023(JFB)(MDG), 2008 WL 5273992, at *18 (E.D.N.Y.
Dec. 18, 2008) (denying summary judgment on retaliation claim where there was
evidence that plaintiff was subjected to several adverse actions – the first of which
occurred shortly after his protected activity and the last of which occurred three or four
months after his protected activity – and also that "many of the actions taken against him
were without factual basis"); <u>Mandel v. Champion Int'l Corp.</u>, 361 F. Supp. 2d 320, 326-

27 (S.D.N.Y. 2005) (denying summary judgment on retaliation claim where stated reason

for plaintiff's termination was performance problems, but employee offered evidence that

the number of complaints about her "increased significantly" after she engaged in

protected activity).

### III.    PLAINTIFF'S STATE LAW RETALIATION CLAIMS AGAINST HESSE[20]

Defendants argue that, as a matter of law, Hesse cannot be held liable

either directly or as an aider/abettor under the NYSHRL.  (Def. Br. at 16-19)  However,

Hesse is not entitled to summary judgment concerning the adverse actions for which

Arms Acres can potentially be held liable.

### A.    Direct Liability

"[A] plaintiff may proceed against an individual defendant under the direct

liability provision of NYSHRL, § 296(1)(a), if the defendant . . . has the power to hire

and fire the plaintiff."  Messer v. Fahnestock & Co. Inc., No. 03-Civ.-4989, 2008 WL

4934608, at *9 (E.D.N.Y. Nov. 18, 2008).  To be held liable under this theory, the

defendant must have "power to do more than carry out personnel decisions made by

others."  Dawson v. County of Westchester, 351 F. Supp. 2d 176, 198 (S.D.N.Y. 2004)

(internal quotation omitted); see also Patrowich v. Chem. Bank, 63 N.Y.2d 541, 542

---

[20]  Mugavero also asserted state law aiding-and-abetting claims against Arms Acres in her Complaint.  Defendants have argued that they are entitled to summary judgment on those claims (Def. Br. at 19), but Plaintiff did not address them in her memorandum of law opposing summary judgment.  Accordingly, those claims have been abandoned and are therefore dismissed.  See Bronx Chrysler Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002) (dismissing claim as abandoned because party opposing summary judgment "made no argument in support of th[e] claim at all" in its summary judgment opposition papers); Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (dismissing as abandoned claims that defendants addressed in motion for summary judgment but plaintiff failed to address in his opposition papers).

(1984) (a defendant cannot be individually liable under the NYSHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others").  In addition to allowing NYSHRL Section 296.1 claims to proceed against individual defendants who allegedly "had the power to hire and fire" the plaintiff, Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006), courts also permit such claims to proceed where the defendant allegedly "had the authority to set schedules and salaries, and to assign hours to the employees, without consultation."  Chamblee v. Harris & Harris, Inc., 154 F. Supp. 2d 670, 677 (S.D.N.Y. 2001).

Plaintiff argues that Hesse is not entitled to summary judgment on her direct liability claims against him because he had the power to fire her.  (Pltf. Br. at 18)  She cites the testimony of Arms Acres' Executive Director, Wallace-Moore, that in August 2002 Hesse had the authority to terminate Plaintiff's employment, although he would have had to discuss such an action first with Wallace-Moore and Berkowitz. (Wallace-Moore Dep. 79:13-24)  It is also uncontested that – at least through July 2002 – Hesse "was responsible for setting Plaintiff's work schedule, evaluating Plaintiff's job performance and disciplining Plaintiff."  (Def. Rule 56.1 Stat. ¶¶ 30-31; Pltf. Rule 56.1 Resp. ¶¶ 30-31)  Given these facts, Hesse is not entitled to summary judgment on Plaintiff's claims against him under NYSHRL Section 296.1 for retaliatory acts that occurred through July 2002.  See Prince, 427 F. Supp. 2d at 385; Chamblee, 154 F. Supp. 2d at 677.  However, Plaintiff has not offered any evidence showing that Hesse had the authority to hire or fire her, or change her schedule or salary, after July 2002.

Accordingly, Hesse is entitled to summary judgment on Plaintiffs NYSHRL Section 296.1 claim against him for her termination in October 2002.

### B.   Aiding and Abetting Liability

If the employer's liability has been established under the NYSHRL, an individual employee may be liable under Section 296.6 of the NYSHRL for aiding and abetting the employer's violation if he "actually participates in the conduct giving rise to" the claim.  Feingold, 366 F.3d at 158 (internal quotation omitted); Sowemimo v. D.A.O.R. Sec .. Inc., 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999) ("[B]efore an individual may be considered an aider and abettor" under the NYSHRL, the employer's liability "must first be established.").  Here, Plaintiff has offered evidence from which a jury could find that Hesse directly participated in the conduct that gives rise to each of her viable retaliation claims by providing information (or misinformation) about her conduct and Arms Acres' policies and protocols.  Therefore, Hesse is not entitled to summary judgment on Plaintiff's aiding-and-abetting retaliation claims relating to the April 24, May 3, July 25, and October 2002 adverse actions.  However, because Plaintiff cannot prevail on any other retaliation claims against Arms Acres, her Section 296.6 claims against Hesse must otherwise be dismissed.

## IV.   DAMAGES

Defendants argue that this Court should find as a matter of law that Plaintiff is not entitled to:  (l) punitive damages, or (2) damages for lost pay after August 13, 2004, when Defendants learned that Plaintiff had surreptitiously taped conversations that revealed confidential patient information and had provided copies of the tapes to her attorney.  (Def. Br. at 23-25)  Defendants have not established that Plaintiff should be

barred from recovering either type of damages, however, except with respect to punitive

damages for conduct occurring after August 6, 2002.

      A.    **Punitive Damages**

      A plaintiff is not entitled to punitive damages under Title VII[21] unless the

employer "engaged in intentional discrimination . . . with malice or with reckless

indifference to the federally protected rights of an aggrieved individual." Zimmermann

v. Assoc. First Capital Corp., 251 F.3d 376, 384 (2d Cir. 2001) (internal quotation

omitted).  Thus, an employer may establish an affirmative defense to a punitive damages

claim by showing "both that it had an antidiscrimination policy and made a good faith

effort to enforce it."  Id. at 385.  Defendants argue that Plaintiff is not entitled to punitive

damages because "Arms Acres has promulgated a comprehensive program designed to

prevent and remedy claims of discrimination, harassment and retaliation in the

workplace." (Def. Br. at 25 (citing Def. Rule 56.1 Stat. ¶¶ 51-80))

      It is undisputed that Plaintiff attended a training that Arms Acres held on

or about August 6, 2002, at which Arms Acres' sexual harassment policy was discussed,

and that Plaintiff was also given a copy of the policy at the training.  (Def. Rule 56.1 Stat.

¶¶ 66-67, 69; Pltf. Rule 56.1 ¶¶ 66-67, 69)  The policy states that "any employee

participating in an investigation" concerning a sexual harassment complaint made under

the policy "has the company's assurance that no reprisals will be taken as a result of a

sexual harassment complaint made in good faith."  (Def. Ex. J at 407)  It also contains

instructions for reporting complaints of retaliation and describes the steps that Arms

---

[21] Punitive damages are not available under the NYSHRL.  Farias v. Instructional Sys.,
Inc., 259 F.3d 91, 101 (2d Cir. 2001).

Acres would take to investigate any complaints.  (Def. Ex. J at 407-08) (<u>See also</u> Def. Rule 56.1 Stat. ¶ 73; Pltf. Rule 56.1 Resp. ¶ 73 (admitting that the sexual harassment policy "prohibits reprisals for making complaints of perceived harassment in good faith")).  Plaintiff has not argued – or offered evidence to support a finding – that Arms Acres did not have an appropriate anti-retaliation policy in place or did not make a good faith effort to enforce it after August 6, 2002.  (<u>See</u> Pltf. Br. at 23-25)  Therefore, Defendants are entitled to summary judgment on Plaintiffs claim for punitive damages stemming from conduct that occurred on or after August 6, 2002.

However, Defendants have not offered sufficient undisputed evidence to establish as a matter of law that they had an adequate policy in place, and made a good faith effort to enforce it, prior to August 6, 2002.[22]  Therefore, they have not shown that they are entitled to summary judgment on Plaintiff's claim for punitive damages relating to retaliatory acts that occurred prior to when she received the policy on August 6, 2002.

### B.     <u>Recovery for Lost Pay</u>

Defendants argue that under the after-acquired evidence doctrine, Plaintiff's claim for lost pay should be barred except as to the time period from October

---

[22]  Defendants cite numerous paragraphs from their Rule 56.1 Statement concerning this issue, but none of them contain facts from which a jury could find that Defendants had an anti-retaliation policy in place prior to August 6, 2002 and took steps to enforce it.  The most potentially significant fact that Defendants cite is that Plaintiff received a copy of Arms Acres' Employee Handbook in 1995.  (Def. Rule 56.1 Stat. ¶ 53; Pltf. Rule 56.1 Resp. ¶ 53; Def. Ex. Q at 25)  However, the copy of the Handbook offered by Defendants is missing the page listed in the Table of Contents as containing a "Non-Harassment Policy."  (Def. Ex. Q)  Therefore, the record contains no basis for this Court to conclude that the 1995 policy adequately addressed complaints of retaliation for reporting sexual harassment.  Moreover, even if the policy were in the record, there would be no factual basis to find that Defendants made a good faith effort to enforce the policy prior to August 6, 2002, because there is no evidence, for example, that Arms Acres trained its employees with respect to retaliation provisions.

25, 2002 through August 13, 2004.  (Def. Br. at 23)  However, Defendants have not

shown that they are entitled to summary judgment on this issue.

    The Supreme Court has held that "evidence that the employee would have

been terminated for lawful reasons will make certain remedies, such as reinstatement and

front pay, unavailable," Greene v. Coach, Inc., 218 F. Supp. 2d 404, 412 (S.D.N.Y. 2002)

(citing McKennon v. Nashville Banner Pub'g Co., 513 U.S. 352, 362 (1995)), and that an

award of back pay would properly "be limited [ in such cases] to salary lost from the date

of the unlawful discharge until the date the employer discovered the information which

would have led to discharge on lawful grounds," Flores v. Buy Buy Baby, Inc., 118 F.

Supp. 2d 425, 432-33 (S.D.N.Y. 2000) (citing McKennon, 513 U.S. at 361-62).

    To show that a plaintiff's damages should be limited under this theory, "an

employer must establish that the wrongdoing was of such severity that the employee

would have been terminated on such ground alone if the employer had known of it at the

time of discharge." Greene, 218 F. Supp. 2d at 412.  Summary judgment on this question

"is inappropriate" if the plaintiff "raise[s] a material issue of fact as to whether the after-

acquired evidence would actually be a basis for termination."  Id. at 413; Flores, 118 F.

Supp. 2d at 433 (denying summary judgment where "[t]here remain[ed] material issues

of relevant fact as to whether . . . [the employer] would have fired . . . [the plaintiff]

solely on the basis of her falsified employment application").

    Defendants argue that this doctrine applies here because Plaintiff

"surreptitiously tape recorded" conversations with Arms Acres staff "during which

Plaintiff knew confidential information regarding patient medical treatment would be

discussed, and subsequently delivered the unredacted tapes to her attorney."  (Def. Br. at

23 (citing Def. Rule 56.1 Stat. ¶¶ 376-93))  Defendants further argue that they would

have terminated her employment had they known of this conduct.  (Id. at 24 (citing Def.

Rule 56.1 Stat. ¶ 393))  However, Defendants' evidence supports only their argument that

Plaintiff's conduct "would have been sufficient to support the termination of Plaintiff's

employment" under their policies (Def. Rule 56.1 Stat. ¶ 393; Pltf. Rule 56.1 Resp. ¶

393) – not that Plaintiff's conduct "would actually [have been a] . . . basis for

termination."  Greene, 218 F. Supp. 2d at 413 (emphasis added).

> The evidence in the record creates a genuine factual dispute as to whether

Plaintiff's conduct, standing alone, would have resulted in her termination.  Wallace-

Moore stated at her deposition that it was Plaintiff's "disclosure of . . . [confidential

patient] information" to her attorney, not her taping of the conversations, that would have

been sufficient to terminate her employment.  (Wallace-Moore Dep. 65:21-66:3)

However, Wallace-Moore could not recall that any Arms Acres employee had ever been

terminated for disclosing confidential patient information.  (Id. 66: 19-21)  Moreover,

Plaintiff has offered evidence suggesting that at least four other Arms Acres employees

had improperly disclosed confidential patient information and had received discipline

short of termination.  (Pltf. Rule 56.1 Stat. ¶¶ 647-652)  Accordingly, Defendants are not

entitled to summary judgment on the question of whether the after-acquired evidence

doctrine applies here.  Flores, 118 F. Supp. 2d at 433.

## V.      PLAINTIFF'S TORT CLAIMS

### A.      Intentional Infliction of Emotional Distress

> Defendants argue that Plaintiff's claim for intentional infliction of

emotional distress is time-barred to the extent it is based on actions that occurred before

August 1, 2002 (one year before Plaintiff filed the Complaint), and that the complained-of conduct that occurred after August 1, 2002 – Hesse's stating that Plaintiff was fired and Arms Acres' October 2002 decision to terminate Plaintiff's employment – is insufficient to support an IIED claim under New York law.  (Def. Br. at 20-21)  Plaintiff argues that she should be permitted to proceed on the theory that Hesse's conduct, beginning on April 24, 2002, constituted a "deliberate and malicious campaign of harassment or intimidation."  (Pltf. Br. at 19)  In so arguing, Plaintiff presumably seeks to avoid the statute of limitations problem on the theory that Defendants' conduct constituted a continuing tort, in which case she could "rely on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final actionable event occurred within one year of the suit."  Shannon v. MTA Metro-North R.R., 269 A.D.2d 218, 219 (1st Dep't 2000) (discussing continuing tort doctrine in context of IIED claim).

      "To make out a claim for intentional infliction of emotional distress under New York law, a plaintiff must plead:  (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."  Lee v. Sony BMG Music Entertainment, Inc., 557 F. Supp. 2d 418, 426 (S.D.N.Y. 2008).  "[T]he standard for making out a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy.'"  Lee, 557 F. Supp. at 426 (quoting Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993)).

      The conduct that occurred within one year of this suit – Hesse telling Plaintiff that she was fired and Wallace-Moore terminating Plaintiff's employment – is

not sufficiently extreme or outrageous to state an emotional distress claim under New York law.  Indeed, none of the cases cited by Plaintiff support her argument that the conduct at issue here is "extreme or outrageous," and she relies on one case establishing the proposition that a plaintiff may not "subvert the traditional at-will contract rule by casting his cause of action [concerning the termination of his employment] in terms of a tort of intentional infliction of emotional distress." Murphy v. Am. Home Prod. Corp., 58 N.Y.2d 293, 303 (1983).[23]  Defendants are entitled to summary judgment on Plaintiff's emotional distress claim.

    **B.**    **Prima Facie Tort**

        Plaintiff also asserts a state law claim for prima facie tort based on Hesse's request that the OPD investigate her in July 2002.  (Cmplt. ¶¶ 110-16)  To prevail on this claim, Plaintiff must show:  "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful." Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir. 1990).  "The touchstone is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." Id.

---

[23]  The following cases cited by Plaintiff likewise do not support her position:  Herlihy v. Metropolitan Museum of Art, 214 A.D.2d 250, 263 (1st Dep't 1995) (plaintiff could not state emotional distress claim based on allegations that she was falsely accused of making anti-Semitic remarks); Nader v. Gen. Motors Corp., 25 N.Y.2d 560, 571 (1970) (stating in passing that "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation, a remedy is available in the form of an action for the intentional infliction of emotional distress," but not otherwise addressing the plaintiff's emotional distress claim, which was based on alleged violations of his privacy); Murphy v. ERA United Realty, 251 A.D.2d 469, 473-74 (2d Dep't 1998) (agreeing without explanation that defendants were not entitled to summary judgment on emotional distress claim relating to sexual harassment experienced by plaintiff).

Defendants argue that Plaintiff cannot establish the first three elements of her prima facie tort claim.  (Def. Br. at 22)  As to the first element, Defendants argue that Plaintiff did not suffer harm because the OPD investigation concluded without charges and Plaintiff retained her license.  (Id.)  However, Plaintiff has offered evidence that she suffered harm in the form of emotional distress and the cost of retaining an attorney to defend her in the investigation.  (Mugavero Aff. ¶¶ 10-13)

As to the second element, Defendants argue that Plaintiff has failed to plead specific damages with sufficient particularity.  (Def. Br. at 22)  However, in her affidavit opposing summary judgment, Plaintiff states that she incurred $2,698.00 in legal costs related to the OPD investigation.  (Mugavero Aff. ¶ 12)  This statement is sufficient to satisfy the requirement of showing special damages.  Cf. Roper v. Hynes, No. 05 Civ. 7664(WHP), 2006 WL 2773032, at *14 (S.D.N.Y. Sep. 27, 2006) (dismissing prima facie tort claim where plaintiff did not "specifically state the cumulative total of such damages, much less itemize which damages are attributable to any particular incident of allegedly tortious conduct").

As to the first and third elements, Defendants argue that Plaintiff cannot show that Hesse's "sole intent" in requesting the OPD investigation was to harm Plaintiff, rather than that he was "concerned about his own license and the health and safety of Arms Acres' patients."  (Def. Br. at 22 (citing Def. Rule 56.1 Stat. ¶¶ 328-33))  However, Plaintiff has offered evidence from which a jury could find that Hesse did not have a good faith basis for making the request, and could thus infer that in taking a step that could result not only in the loss of Plaintiff's job at Arms Acres but in the loss of her nursing licenses, Hesse's sole intent was to harm Plaintiff.  (See supra pp. 35-37)

Therefore, Defendants have not shown that they are entitled to summary judgment on Plaintiff's prima facie tort claim.[24]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Docket No. 31) is GRANTED IN PART and DENIED IN PART.  Defendants' motion is granted with respect to the claims the Court has found Plaintiff to have abandoned; Plaintiff's intentional infliction of emotional distress claim; Plaintiff's claim for punitive damages based on any alleged retaliation that occurred after August 6, 2002; and Plaintiff's retaliation claims against both Defendants insofar as they arise from her allegations that she was subjected to "retaliatory hostility . . . [and] criticism," closer scrutiny of her work performance, the change in her day off, or Hesse's August 6, 2002 statement that she was fired.  Defendants' motion is further granted with respect to

---

[24]  Defendants argue, without citing any case law, that Plaintiff should not be allowed to recover punitive damages with respect to her prima facie tort claim because Arms Acres had an appropriate anti-retaliation policy in place.  (Def. Br. at 25 n.15)  However, even if the Court were to assume that the test for awarding punitive damages is the same for Title VII retaliation and prima facie tort claims, there is no basis to preclude Plaintiff from recovering damages for conduct that occurred prior to August 6, 2002, including Hesse's conduct in asking the OPD to investigate Plaintiff.  (See supra pp. 47-48)

  Defendants also argue that Plaintiff's prima facie tort claim is a "catch-all alternative" to her other claims, and that she cannot recover damages under both her prima facie tort claim and her emotional distress claim.  (Def. Reply Br. at 9-10)  However, this is not a basis for denying Plaintiff the opportunity to proceed to trial on all viable theories of recovery.  Hughes v. Patrolmen's Benev. Ass'n of City of New York, Inv., 350 F.2d 876, 882 (2d Cir. 1988) (explaining that "[w]hat New York law prohibits is recovery of damages for both a traditional tort such as the intentional infliction of emotional distress and for a prima facie tort," and that a plaintiff may still plead intentional infliction of emotional distress and prima facie tort in the alternative and present both theories to a jury); Wahlstrom v. Metro-North Commuter R. Co., 89 F. Supp. 2d 506, 532 n.24 (S.D.N.Y. 2000) (explaining that in a case where a plaintiff may have a valid traditional tort claim, such as a claim for emotional distress, "the prima facie tort claim does not 'disappear[]' until 'a traditional tort is established'" (internal citation omitted)).

Plaintiff's NYSHRL Section 296.1 retaliation claim against Hesse to the extent that claim

relates to Plaintiff being placed on administrative leave in October 2002 and to the

subsequent termination of her employment.  In all other respects, Defendants' motion is

DENIED.

Dated: New York, New York             SO ORDERED.
      March 31, 2009

                                        Paul G. Gardephe
                                        United States District Judge