UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LESLIE MUGAVERO,

                    Plaintiff,                    **MEMORANDUM OPINION
                                                  AND ORDER**

          - against -

ARMS ACRES, INC. and FREDERICK                    No. 03 Civ. 05724 (PGG)
HESSE, M.D.,

                    Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

          In this action, Plaintiff Leslie Mugavero seeks relief under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et seq. ("Title VII") and New York law for

alleged retaliation by her former employer, Arms Acres, Inc. ("Arms Acres") and her

former supervisor, Dr. Frederick Hesse. (Cmplt. Counts I, II, III, IV) Mugavero alleges

that after she supported a co-worker's sexual harassment complaint, Defendants retaliated

against her by, inter alia, issuing her written disciplinary warnings, reporting her to New

York State's Office of Professional Discipline for professional misconduct, and

ultimately terminating her employment. (Id.) Following an eight-day trial, a jury

rendered a verdict in Mugavero's favor against both defendants, and awarded Mugavero

a total of $764,183 in compensatory damages and $350,000 in punitive damages.

          The Defendants have moved for judgment as a matter of law, for a new

trial, for discovery sanctions and to vacate or reduce the damage awards. (Docket Nos.

105, 108, 110, and 112). For the reasons stated below, Defendants' motions for judgment

as a matter of law and for a new trial (Docket Nos. 105, 108) are DENIED; Defendants'

motion to vacate or reduce the damage awards (Docket No. 110) is GRANTED IN PART

and DENIED IN PART; and Defendants' motion for discovery sanctions (Docket No. 112) is GRANTED, insofar as attorneys' fees and costs are awarded.

**DISCUSSION**

## I.  BACKGROUND

Defendant Arms Acres is a drug and alcohol rehabilitation facility. (Tr. 97:20-23) During the relevant time period, Mugavero was employed at Arms Acres as a nurse practitioner and was supervised by Defendant Hesse, who was Arms Acres' medical director. (Tr. 68:23-25, 69:14-16, 299:20-300:10, 302:6-9) Mugavero asserts that Hesse began retaliating against her in a variety of ways after she informed him in late April 2002 that Marie McArdle, an Arms Acres nurse, was going to make a sexual harassment complaint against the facility's Director of Psychiatry, Dr. Omar Gutierrez – a complaint that Mugavero formally supported with a written statement on May 1, 2002. (Tr. 108:21-109:21, 687:17-688:2, 950:7-10, 952:2-25) Mugavero claims that Hesse's retaliation escalated over time and included (1) reporting her to the New York State Office of Professional Discipline ("OPD") for alleged professional misconduct in July 2002; and (2) instigating the termination of her Arms Acres employment in October 2002. (Tr. 1903:12-20, 1907:18-24)

The Court granted Defendants summary judgment on certain of Mugavero's claims in March 2009. Mugavero v. Arms Acres, Inc. et al., No. 03-Civ.-5724(PGG), 2009 WL 890063 (S.D.N.Y. Mar. 31, 2009). The case then proceeded to trial on Mugavero's claims that the following actions constituted unlawful retaliation under federal and New York law: (1) the removal of her on-call duties on the evening of April 24, 2002; (2) a May 2002 written warning; (3) an August 2002 written warning; (4) Hesse's oral and written requests in July and August 2002 that the OPD investigate her

for professional misconduct; (5) Arms Acres placing her on administrative leave on October 1, 2002; and (6) Arms Acres terminating her employment effective October 25, 2002.[1]  (See Tr. 154:25-155:18, 191:21-192:2, 585:21-24, 1966:6-15; JX 60 (May 2002 written warning); JX 62 (August 2002 written warning); JX 109 (written complaint to OPD))

The jury found that Mugavero proved all elements of her retaliation claim against both defendants with respect to each of the alleged adverse actions.  (Tr. 2016:16-2017:14, 2018:12-2019:3, 2019:20-2020:16)  The jury also found, however, that Arms Acres – but not Hesse – had proven an affirmative defense with respect to the removal of Mugavero's on-call duties and the two written warnings – i.e., Arms Acres had proven that it would have taken the adverse actions regardless of any retaliatory motive.  (Tr. 2017:15-2018:11, 2019:4-2019:19)  The jury found that Hesse was directly liable under state law for the first four adverse actions and liable as an aider and abettor under state law for Mugavero's placement on administrative leave and the termination of her employment.  (Tr. 2018:12-2019:3, 2019:20-2020:16)

With respect to damages, the jury found that Mugavero had not proven that she was entitled to compensation for the removal of her on-call duties or for the two written warnings.  (Tr. 2020:17-2021:3)  It awarded her the following compensatory damages for emotional distress relating to the three later adverse actions:  $75,000 for Hesse's request that the OPD investigate Mugavero; $75,000 for placing Mugavero on

_____

[1]  Mugavero was also allowed to proceed to trial on her claim that Hesse's report to OPD constituted prima facie tort under New York law.  The Court granted Defendants judgment as a matter of law on this claim at the close of Defendants' case, however, after Mugavero conceded that she had not offered evidence establishing the elements of this claim.  (Tr. 1825:11-1827:6, 1828:4-9)

administrative leave; and $100,000 for the termination of her employment. (Tr. 2021:8-2021:23) The jury also awarded Mugavero $468,183 in lost wages and $46,000 in lost fringe benefits. (Tr. 2021:24-2022:2) Finally, the jury awarded $350,000 in punitive damages with respect to the OPD investigation claim. (Tr. 2022:7-2022:24)

## II. DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR TO A NEW TRIAL ON PLAINTIFF'S RETALIATION CLAIMS

Defendants seek judgment as a matter of law with respect to Mugavero's claims that they unlawfully retaliated against her by placing her on administrative leave and terminating her employment. (Def. JMOL Br. (Docket No. 107) at 4-13) In addition, Arms Acres argues that it is entitled to judgment as a matter of law on Mugavero's retaliation claim concerning Hesse's report to OPD. (Id. at 13-14) Defendants argue that, in the alternative, they are entitled to a new trial on those retaliation claims. (Def. New Trial Br. (Docket No. 109) at 3-6)

The standard for granting judgment as a matter of law under Rule 50 is "well established":

> Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law should not be granted unless
>
> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 288 (2d Cir. 1998); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008) (same).

In order for the Court "to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . [that] the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotations omitted). The Rule 59(a) standard is "less stringent" than the standard for granting judgment as a matter of law under Rule 50 "in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."[2] Id. at 244-45 (internal quotations omitted). In weighing the evidence, however, the Court "should not ordinarily ignore the jury's role in resolving factual disputes" and assessing witness credibility. MacMaster v. City of Rochester, No. 05-Civ.-06509, 2009 WL 63045, at *6 (W.D.N.Y. Jan. 6, 2009).

A.    **Mugavero's Retaliatory Termination Claim**

To prove a retaliation claim at trial under federal or state law, a plaintiff must show:

---

[2] In some cases, the Second Circuit has stated that in deciding a Rule 59 motion for a new trial, it would "view the record in the light most favorable to . . . the party against whom a new trial is sought." Kerman v. City of New York, 374 F.3d 93, 122 (2d Cir. 2004) (citing cases). The prevailing rule, however, is the standard set forth in Manley v. AmBase Corp., 337 F.3d 237 (2d Cir. 2003). See 11 Wright, Miller & Kane, Federal Practice & Procedure § 2806 (2d ed. 1995) (in deciding a Rule 59 motion, "[t]he judge is not required to take that view of the evidence most favorable to the verdict-winner").

> by a preponderance of the evidence that: (1) [the plaintiff]
> participated in a protected activity, (2) the defendant knew
> of the protected activity; (3) [the plaintiff] experienced an
> adverse employment action; and (4) a causal connection
> exists between the protected activity and the adverse
> employment action. <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205,
> 216 (2d Cir. 2001). The McDonnell Douglas burden
> shifting analysis applies to retaliation claims brought
> pursuant to Title VII**.** <u>See</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128,
> 140-41 (2d Cir. 2003). Accordingly, if a plaintiff properly
> alleges a <u>prima facie</u> case of retaliation, and the employer
> proffers a legitimate, non-retaliatory reason for the
> challenged employment decision, the plaintiff must present
> evidence that would be sufficient to permit a rational jury
> to conclude that the employer's explanation is merely a
> pretext for impermissible retaliation. <u>See</u> <u>Cifra v. Gen.
> Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001)(citations
> omitted).[3]

<u>Jackson v. New York City Transit</u>, No. 08-2021-cv, 2009 WL 3287558, at *2 (2d Cir.

Oct. 14, 2009)(emphasis in original). Defendants argue that they are entitled to judgment

as a matter of law or a new trial on Plaintiff's retaliatory termination claim because: (1)

the evidence was insufficient for a jury to find that Hesse had retaliatory animus toward

Plaintiff; and (2) even if the jury could have found that Hesse had retaliatory animus, the

evidence did not show that Hesse played a sufficiently significant role in the decision to

terminate Plaintiff's employment such that his retaliatory animus tainted that decision.

(Def. JMOL Br. at 4; Def. New Trial Br. at 3) The record, however, contains ample

evidence to support the jury's findings on both issues. Indeed, Defendants' post-trial

---

[3] The jury was so instructed. (Tr. 1963:22-1964:9). Retaliation claims under Title VII
and the New York State Human Rights Law ("NYSHRL") are subject to the same
analysis. <u>Ludwig v. Rochester Psychiatric Ctr.</u>, No. 08 Civ. 2361, 2009 WL 3160570, at
*1 n. 1 (2d Cir. Oct. 1, 2009) (citing <u>Salamon v. Our Lady of Victory Hosp.</u>, 514 F.3d
217, 226 n.9 (2d Cir. 2008) ("We typically treat Title VII and NYHRL discrimination
claims as analytically identical, applying the same standard of proof to both claims.")).

motions merely re-argue contested issues of fact and credibility determinations that the jury resolved against the Defendants.

### 1.   Hesse's Retaliatory Intent

The evidence concerning Hesse's retaliatory animus was three-fold:  first, there was evidence supporting a finding that Hesse began taking adverse action against Mugavero within a few days of her complaining about an Arms Acres doctor's sexual harassment of nurse Marie McArdle; second, there was evidence that the stated reasons for the adverse actions were pretextual or that the actions were taken in bad faith; and third, there was evidence that Hesse felt "threaten[ed]" (Tr. 500:23-501:9) by Mugavero's decision to support McArdle's harassment complaint and solicited unfounded complaints against both Mugavero and McArdle.

### a.   Timing

As the jury was instructed – without objection from Defendants – retaliatory intent may be inferred when the plaintiff's protected activity is "followed closely in time" by an adverse action.  (Tr. 1969:12-14; see also Tr. 1692-1713 (no objection from Defendants at charge conference; Tr. 1988:2-4 (no objection from Defendants after jury was charged))

Here, Mugavero's testimony indicated that she first engaged in protected activity early in the week of April 21, 2002, when she told Hesse that (1) McArdle was going to report Dr. Omar Gutierrez for sexual harassment; and (2) Mugavero had witnessed Gutierrez kissing McArdle at Arms Acres.[4]  (Tr. 687:17-688:2, 950:7-10,

---

[4]  At trial, Hesse admitted that Mugavero told him at some point after April 20, 2002, that McArdle was going to report Gutierrez for sexual harassment, but gave inconsistent testimony as to whether the conversation occurred before or after McArdle filed her

952:12-25) Dr. Gutierrez reported to Hesse and was the only other doctor employed at Arms Acres. (J.X. 1) It was undisputed that three days later, on April 24, 2002, Hesse relieved Mugavero of her on-call duties, which the jury found was a material adverse action.[5] Such a close temporal connection between a plaintiff's protected activity and an adverse action is sufficient to give rise to an inference of retaliatory intent. See Feingold v. New York, 366 F.3d 138, 156-7 (2d Cir. 2004) (holding that the "requirement that . . . [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two," which was two weeks); Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (plaintiff established fourth element of retaliation claim where adverse action occurred twelve days after protected activity).

Defendants argue that any inference of retaliatory intent created by the timing of Mugavero's first protected activity and the first adverse action cannot, as a matter of law, be extended to the adverse actions that occurred months later, including her placement on administrative leave and termination in October 2002. (Def. JMOL Br. at 9-10) Their argument, however, is not supported by the case law. The cases Defendants cite arise in the summary judgment context and indicate that, where there is a

_____

formal complaint on May 1, 2002. (Tr. 500:23-501:24, 502:5-17, 628:5-11) In finding that Mugavero proved all elements of her retaliation claim with respect to the April 24, 2002 removal of her on-call duties, the jury implicitly found that Mugavero's conversation with Hesse occurred before the evening of April 24 and constituted protected activity. Defendants do not contend that this implicit finding is unsupported by the evidence.

[5] As noted above, the jury found that Mugavero proved all elements of her retaliation claim with respect to the April 24, 2002 removal of her on-call duties. Whether this change constituted a material adverse action was a fact issue that the jury resolved against the Defendants. (Tr. 1966:6-19)

gap of three or more months between the protected activity and the adverse action, the timing – <u>standing alone</u> – is insufficient to give rise to an inference of retaliation. (<u>See</u> Def. Br. at 10) Such cases are inapplicable here because, as discussed below, there was evidence other than timing to support such an inference. (<u>See</u> <u>infra</u> pp. 7-19)

Moreover, as the Court held in its summary judgment opinion, the six-month gap between Plaintiff's first protected activity and her termination is not fatal to her retaliation claim where there is evidence that Plaintiff's termination was the culmination of a series of retaliatory adverse actions that began within days of her protected activity. <u>Mugavero</u>, 2009 WL 890063, at *12-13. Mugavero presented such evidence at trial.

During the trial, it was undisputed that Hesse and Mugavero's relationship changed dramatically on or about April 24, 2002. Prior to that time, Hesse and Mugavero had a longstanding, close working relationship and personal friendship.[6] There was substantial evidence – corroborated by several of their co-workers – that immediately following April 24, 2002, Hesse's "attitude changed" and he was "cold" toward Mugavero. (Tr. 1501:23-1502:8 (testimony of co-worker Steven Herzenberg); <u>see also</u> Tr. 1460:8-13 (testimony of co-work Sofia Umali that after April 24, Hesse and

---

[6] Hesse and Mugavero first met in the 1980s when they both worked at Danbury Hospital. (Tr. 298:20-299:15) At Arms Acres, they frequently had lunch together, and their families socialized. (Tr. 148:4-11, 460:21-25) Hesse agreed that by 2002, they had a long-term friendship. (Tr. 461:14-17; <u>see also</u> Tr. 1336:20-23 (co-worker Michelle DeMarco testifying that she observed Hesse and Mugavero to have "a very good relationship, both professionally, and socially"); 1491:23-1492:4 (co-worker Steven Herzenberg testifying that Hesse and Mugavero were "friendly" and would socialize with a group of co-workers)).

Mugavero's relationship became "very formal," "almost terse and cold")) After April 24, Hesse and Mugavero also stopped socializing. (Tr. 523:1-17, 1502:13-21)

According to Mugavero, after April 24, 2002, Hesse also stopped informally discussing patient issues with her and began routinely criticizing her medical discharge summaries, an important part of her duties. (Tr. 667:12-668:7, 669:18-670:8, 313: 8-10) In contrast, Hesse's July 2001 written evaluation of Mugavero states that she had "excellent discharge summaries." (Tr. 612:7-613:2)

The evidence also demonstrates that Hesse was involved in a series of adverse actions that followed the April 24, 2002 removal of Mugavero's on-call duties:

- Hesse began drafting Mugavero's first written warning on April 30 and issued it to her on May 3, 2002 (see Tr. 125:9-22; JX 59 (April 30, 2002 draft warning); Tr. 130:4-7; JX 60 (May 3, 2002 final warning));

- Hesse first reported Mugavero's alleged professional misconduct to OPD in mid-July 2002 and sent a letter to OPD on August 19, 2002, formally asking the agency to investigate her (Tr. 571:16-573:25, 574:1-9, 585:21-24; JX 68 (draft letter to OPD dated July 25, 2002); JX 109 (final letter to OPD dated August 19, 2002);

- Hesse began drafting Mugavero's second written warning on July 25 and issued it to her soon after August 6, 2002 (Tr. 575:1-13; JX 62 (draft warning dated July 25, 2002); and

- Hesse reported to his supervisor, Executive Director Patrice Wallace-Moore in October 2002 (Tr. 64:4-9, 68:21-25) that Mugavero had made an error in responding to a patient's positive pregnancy test and assisted in the investigation of the alleged error, which led to Mugavero being placed on administrative leave and then terminated.[7] (See Tr. 268:2-25, 269:1-12, 276:7-277:4)

---

[7] Prior to reporting Dr. Gutierrez's sexual harassment of Nurse McArdle, Mugavero had never been the subject of discipline at Arms Acres. (Tr. 123: 24-125:3, 134: 12-25, 139: 18-25)

Given the evidence that Hesse took adverse action against Mugavero three days after her first protected activity; that their close friendship and good working relationship ended at the time of her first protected activity; and that Hesse was responsible for or was involved in all of the adverse actions that were taken against Mugavero during the next six months, culminating in her termination, a rational jury could have inferred from the timing alone that the adverse actions were motivated at least in part by retaliatory intent.[8]

**b.**     **Pretext**

In addition to proximity between protected activity and an adverse action, a jury may infer retaliatory intent from evidence that the employer's stated reasons for adverse actions were pretextual, or that the employer took the actions in bad faith or exaggerated the seriousness of the conduct that allegedly justified the adverse action. (See, e.g., Ebanks v. The Neiman Marcus Group, Inc., 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006) (judgment as a matter of law inappropriate because there were genuine factual disputes as to whether employer's reasons for the adverse employment actions

_____

[8]  Contrary to Defendants' argument (Def. Br. at 10), the jury's verdict supports such a finding.  The jury found that Plaintiff had proved all elements of her retaliation claim against both Defendants with respect to the alleged adverse actions that occurred in April, May and August and, accordingly, it must be presumed, that those actions were motivated at least in part by retaliatory intent.  (See supra p. 3; Tr. 1968:3-15 (instruction on retaliatory intent)); Britt v. Garcia, 457 F.3d 264, 272 (2d Cir. 2006) ("It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge." (internal quotation omitted)).  The jury also found that Arms Acres was not liable for the removal of on-call duties and the written warnings because it had proven its affirmative defense – i.e., Arms Acres proved that it would have taken these adverse actions even in the absence of retaliatory intent.  (Tr. 1974:8-14)  The jury's finding that Arms Acres had proven its affirmative defense as to these three adverse actions does not negate the jury's finding that Arms Acres had acted with retaliatory intent as to all six alleged adverse actions, however.

"were in part pretextual"); <u>Rooney v. Capital Dist. Transp. Auth.</u>, 109 F. Supp. 2d 86, 98-99 (N.D.N.Y. 2000) (judgment as a matter of law inappropriate because there was "a sufficient basis for a trier of fact to conclude . . . that the reasons defendant offered for plaintiff's dismissal were at least partially pretextual").

The jury was instructed in accordance with the above case law, without objection from the Defendants. (Tr. 1969:8-16, 1970:19-1971:1; <u>see also</u> Tr. 1692-1713, 1988:2-4 (no objection from Defendants at charge conference or after jury was instructed)) There was sufficient evidence at trial for the jury to find both pretext and bad faith.

### i.  The Early Adverse Actions

As to pretext, Defendants argued at trial, as they do now, that Hesse's first adverse actions against Mugavero – beginning on April 24, 2002 with the removal of her on-call duties and continuing through the two written warnings – were a response to Executive Director Wallace-Moore's increasing pressure on Hesse to discipline Mugavero. (Def. JMOL Br. at 5) The jury heard evidence that Wallace-Moore had been urging Hesse since early 2001 to supervise Mugavero more closely and to take action with respect to repeated complaints Wallace-Moore had received about Mugavero's interactions with nurses and patients. (<u>See, e.g.</u>, Tr. 78:25-79:22, 87:3-9; JX 39 (Wallace-Moore's notes from supervision meetings with Hesse))

There was also undisputed evidence, however, that despite Wallace-Moore's pressure, Hesse took no disciplinary action against Mugavero until April 24, 2002. In early 2001, Wallace-Moore told Hesse that he needed to address complaints regarding Mugavero's interactions with patients and staff, but as of October 2001, he had

not done so.  (Tr. 87:3-9; JX 39)  In December 2001, Wallace-Moore told Hesse that if he "did not address [Mugavero's] professionalism [Wallace-Moore] would."  (Tr. 87:25-88:7; JX 39 at Bates 497)  Wallace-Moore's supervisory notes indicate that in January 2002 Hesse "[s]till struggle[d]" with supervising Mugavero, and he did not provide a requested log of Mugavero's behavior.  (Tr. 89:12-23; JX 40 at Bates 498)  Finally, on April 11, 2002, Wallace-Moore noted that while Mugavero's "work has been relative[ly] good," "her attitude towards other staff and patients ha[s] been questionable" and still "require[s] corrective action[]."  (Tr. 91:7-15; JX 40 at Bates 500)  Because of the undisputed evidence that Hesse had essentially ignored Wallace-Moore's instructions for more than a year, the jury could reasonably have concluded that when he did begin taking disciplinary action against Mugavero on April 24, 2002, he was not motivated by Wallace-Moore's concerns.

### ii.  The OPD Report

There was also evidence from which the jury could have found that Hesse acted vindictively, maliciously, and in bad faith in asking the OPD to investigate Mugavero, in that he purposely misrepresented the facts to the OPD in order to portray Mugavero in a more negative light.  Because the OPD is the state agency responsible for licensing nurses (Tr. 572: 11-23), Hesse's report that Mugavero had engaged in professional misconduct threatened her license and her ability to perform her profession. After a year-long investigation, the OPD closed its file concerning Hesse's complaint with no disciplinary action against Mugavero.  (Tr. 595: 14-24)

With respect to Hesse's misrepresentations, it was undisputed that when Hesse first contacted the OPD by telephone and drafted his letter to the agency, he had

not given Mugavero any written warning concerning the alleged errors discussed in the letter. (Tr. 200:1-3, 571:20-573:25, 575:1-13; PX 62 (draft warning); PX 68 (letter to OPD dated July 25, 2002)) In the letter he drafted, however, Hesse wrote that Arms Acres had "completed investigation and discipline with a written warning," and that Mugavero had "not accepted supervision, and ha[d] been negative in her responses." (PX 68 at Bates 306) None of this was true. Hesse's letter also stated that he was requesting an investigation because he believed Mugavero's errors were part of "an increasing pattern of numbers and severity." (JX 109 at Bates 2189; JX 62 at 438-39 (referring repeatedly to an "increasing pattern" of errors)) The evidence, however, does not support this allegation of an "increasing pattern" of errors – Wallace-Moore's supervisory notes state that any pre-May 2002 errors by Mugavero had "never been noticed," allegedly because of Hesse's poor supervision. (JX 40 at Bates 505 ("NP has however, been found to have many mistakes on her work. Such has never been noticed due to Dr. H's admittedly sporadic if any supervision of NP's work."))

Similarly, the jury could have inferred bad faith and malice from Hesse's description of a June 26, 2002 incident in which Mugavero allegedly abandoned a suicidal patient. (JX 109 at Bates 2188-89 (Hesse's August 19, 2002 letter to OPD)) Hesse's letter states that Mugavero left for lunch without taking steps to make sure that the patient was attended while she was gone, and that Mugavero merely "mentioned in passing in the hallway to nursing staff that she [had] examined a suicidal patient. . . ." (JX 109 at Bates 2188) It was undisputed, however, that the "nursing staff" Mugavero spoke to was nursing supervisor Cindy Lipton, the charge nurse who, under Arms Acres' policy concerning suicidal patients, was responsible for assigning one-on-one care to

such patients.  (JX 15 (policy); Tr. 162:2-4, 163:23-164:4, 1346:7-11)  Psychiatric nurse

practitioner Sofia Umali was also disciplined for her role in the suicidal patient incident –

because she had not returned promptly from lunch to evaluate the patient (DX CC) – but

Umali received her written warning two days after the incident, on June 28, 2002,

whereas Mugavero was not given a written warning concerning the incident until nearly

six weeks later, on August 6, 2002.  While the prompt discipline imposed on Umali

supported an inference that her misconduct was at least as serious as Mugavero's (Tr.

583:3-21; DX CC), only Mugavero, and not Umali, was reported to the OPD.

### iii.  Plaintiff's Termination

There was also evidence from which the jury could have concluded that

the decisions to place Mugavero on administrative leave and later to terminate her

employment were not made in good faith.  According to Human Resources Director

Beverly Berkowitz, who conducted the investigation and recommended Mugavero's

termination, Mugavero had erred when she:  (1) signed off on a lab report showing that a

patient was pregnant without stopping the patient's opiate withdrawal protocol; and (2)

later extended the protocol.  (Tr. 268:19-21, 287:14-15; see also JX 70 (October 25, 2002

memo by Berkowitz stated that Mugavero had signed the lab report and later re-ordered

the opiate withdrawal protocol without notifying anyone that the patient was pregnant))

Mugavero was placed on administrative leave on October 1, 2002,

allegedly so that Berkowitz could investigate whether Mugavero in fact made errors that

resulted in the pregnant patient taking opiate withdrawal medication after the medication

should have been stopped.  (Tr. 268:2-19, 269:10-12)  The jury could reasonably have

found, however, that Berkowitz's investigation was conducted in an unfair manner that

undermined Mugavero's ability to respond and explain what had happened. On October 1, Berkowitz did not tell Mugavero why she was being placed on leave, except to say that Berkowitz needed to do an investigation. (Tr. 269:16-25) During her first investigative interview of Mugavero, Berkowitz asked about the general policy or protocol for treating a pregnant patient, but did not tell her about the particular patient whose treatment Berkowitz was investigating or provide the medical chart for that patient. (Tr. 273:11-275:16)

During a second interview, Berkowitz gave Mugavero excerpts of the patient's chart that Hesse had selected. (Tr. 276:7-277:4) Mugavero testified that it was not until after this litigation ensued – when she obtained the patient's full chart – that she realized that she had probably given the patient's lab report to nurse practitioner Joanne Callahan, who had – as the full chart revealed – initially examined the patient and ordered that she be placed on the opiate withdrawal protocol. (Tr. 725:18-726:12; see also Tr. 1170:5-10) Mugavero testified that it was her practice to review all lab reports when they were delivered in the morning, and to give any non-urgent reports concerning patients initially seen by Joanne Callahan to Callahan for follow-up. (Tr. 656:1-21) While Mugavero raised with Berkowitz the possibility that she had given Callahan the report, Berkowitz disregarded Mugavero's remark because there was no support for this claim in the medical records Berkowitz had consulted. (Tr. 290:16-23)

There was also evidence suggesting that Mugavero was less culpable than Defendants portrayed. While Berkowitz testified that Mugavero was terminated in part because she had re-ordered the pregnant patient's opiate withdrawal protocol, it was undisputed that Mugavero had extended the protocol by giving a voice order in response

16

to a request from a nurse, without looking at the patient's chart. (Tr. 1153:19-1154:12) Physician Assistant Steven Herzenberg testified that it was standard practice at Arms Acres to give a voice order to extend a protocol at a nurse's request without looking at the chart, on the assumption that the protocol would not have been ordered in the first place if it was inappropriate. (Tr. 1500:13-23, 1528:14-20) Indeed, the medical records showed that Joanne Callahan had initially placed the pregnant patient on the opiate withdrawal protocol with a voice order given over the telephone at the request of a nurse. (Tr. 1769:23-1771:1) Hesse also testified that if a patient was admitted in the evening, the patient could receive medication on the basis of a voice order given to a nurse prior to being examined the following day.[9] (Tr. 453:1-13, 457:14-458:5)

### c. Other Circumstantial Evidence of Retaliatory Intent

Finally, Plaintiff's claim that Hesse had acted out of retaliatory intent was supported by evidence that Hesse: (1) viewed Mugavero's report of Gutierrez's misconduct as a threat; and (2) solicited unfounded complaints against both Mugavero and McArdle after Mugavero told him that McArdle intended to report Dr. Gutierrez for sexual harassment.

---

[9] Mugavero also offered evidence showing that Callahan – who was not disciplined – bore some responsibility for the patient having been placed on the opiate withdrawal protocol despite the risk that she was pregnant. Hesse testified, based on the medical records, that Callahan had examined the pregnant patient and noted that the patient's last menstrual cycle started more than 28 days (the normal length of a cycle) earlier. (Tr. 1769:5-7) However, Callahan did not order an expedited urine pregnancy test, and gave a voice order that night for the patient to be placed on a seven-day opiate withdrawal protocol. (Tr. 1769:23-1771:1) Despite the alleged risk the protocol posed to a pregnant woman, Hesse conceded that it was standard practice at Arms Acres to medicate <u>all</u> detoxification patients the day they were admitted if they had withdrawal symptoms (Tr. 451:25-452:14), even if it was not known whether the patient was pregnant.

With respect to Hesse's reaction to Mugavero's report concerning Dr.
Gutierrez, Hesse testified that Mugavero "seemed to be threatening" him with the
possibility of McArdle reporting Dr. Guttierez for sexual harassment.  (Tr. 500: 23-
501:9)  With regard to Hesse's attempt to generate complaints against Mugavero and
McArdle, Nurse Michelle DeMarco testified that almost immediately after Mugavero told
him about McArdle's harassment complaint,[10] Hesse asked DeMarco to "write up a
statement stating that [she] observed . . . Mugavero take a picture at the nursing station,"
which Hesse told DeMarco "was a breach of . . . patient confidentiality."  (Tr. 1341:7-11)
DeMarco refused, and reminded Hesse of two other occasions when employees had taken
photos at the nursing station, including recently for "Take Your Daughter to Work Day."
(Tr. 1341:12-1342:4)  She also mentioned to Hesse that she had kept "for many years" a
photo of herself, Hesse and several other nurses taken at the nursing station in the area of
the board with patients' names written on it.  (Tr. 1342:5-14)  As she spoke, Hesse got
"redder and redder" and "bec[ame] more irate" (Tr. 1343:17-19), and told her that if she
refused to prepare the statement, she "was being insubordinate."[11]  (Tr. 1342:16-18)
DeMarco told him that she did not want to be involved in a "vendetta" against Mugavero.
(Tr. 1343:2, 20-22)  Hesse responded, in substance, that:  "[If] this makes you so anxious
maybe you shouldn't be working here."  (Tr. 1343:22-25)  At that point, DeMarco's

---

[10]  DeMarco could not recall the precise timing, but testified that the incident occurred
after Mugavero took a photograph of a new on-call schedule.  Mugavero testified that she
took the photo on April 25, when the new schedule was posted, and Hesse also testified
that the incident occurred in April 2002. (Tr. 496:14-497:2, 706:4-14, 1405:22-1406:2)

[11]  Hesse did not deny that this incident occurred, but flatly denied telling DeMarco that
she was being insubordinate.  (Tr. 497:22-498:2)

supervisor, who was also present, told DeMarco that she could leave, and Hesse apologized for upsetting her.  (Tr. 1341:3-5, 1344:8, 21-22)

The second incident involved Hesse soliciting a complaint against McArdle.  Hesse testified that on September 6, 2002, he saw McArdle take a patient's blood pressure in an unusual way – with her leg between his legs (Tr. 478:24-479:10, 480:6-8) – and alerted the nursing supervisor, Cindy Lipton.  (Tr. 479:12-19)  Although he was not McArdle's supervisor, Hesse returned to the patient's room four or five hours later, to ask the patient if he "had any concerns" about how his blood pressure had been taken.  (Tr. 482:6-16, 484:7-13)  According to Hesse, the patient responded that "now that he mentioned it it was very odd."  (Tr. 482:13-16)  Hesse testified that he asked the patient if he "want[ed] to write something about it," and the patient "said yes."  (Tr. 483:1-3)  The patient then wrote a short statement, which Hesse took from him.  (Tr. 485: 13-20)  The patient subsequently told Wallace-Moore, however, that he was not comfortable with what he had written about the incident (Tr. 489:20-490:5), and Wallace-Moore instructed Hesse to apologize to the patient and to McArdle, and to return the statement to the patient.  (Tr. 490:21-491:6)

*       *       *

As discussed above, there was substantial evidence supporting the jury's finding that Hesse was motivated by retaliatory intent, including the dramatic change in Hesse's behavior toward Mugavero after she told him about McArdle's sexual harassment complaint (and subsequently supported the complaint with a written letter); Hesse's statement that he felt Mugavero "threaten[ed]" him with the complaint; Hesse's skewing of the facts concerning Mugavero's job performance; and Hesse's efforts to

solicit complaints against both Mugavero and McArdle.  Defendants are neither entitled to judgment as a matter of law nor to a new trial on this issue.

## 2.     **Hesse's Role In Plaintiff's Termination**

Defendants also argue that regardless of Hesse's retaliatory intent, he did not play a sufficient role in the decision to terminate Plaintiff's employment for his retaliatory intent to have tainted that decision.  (Def. JMOL Br. at 6-9)  Defendants are not entitled to judgment as a matter of law on this ground.

The Second Circuit has recognized that "the impermissible bias of a single individual at any stage of the . . . [decision making] process may taint the ultimate employment decision in violation of Title VII."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999).  Therefore, "even absent evidence of illegitimate bias on the part of the decision maker," a plaintiff may establish that an adverse action was taken because of unlawful intent by showing that an "individual shown to have the impermissible bias played a meaningful role in the . . . [decision making] process."  Id.; see also Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 126 (2d Cir. 2004) (holding that lack of bias on the part of the ultimate decision maker was not dispositive where the decision to deny tenure was based on the recommendation of biased individuals, whose "numerous accusations of poor performance . . . were overblown and pretextual"); Owens v. New York City Hous. Auth., 934 F.2d 405, 410 (2d Cir. 1991) (discriminatory comments by individuals who had "substantial influence over [plaintiff's] employment" were sufficient to "raise a genuine issue of fact on the issue of pretextuality" with respect to defendant's stated reason for terminating plaintiff's employment).

Here, there was ample evidence that Hesse played a "meaningful role" in the decision to terminate Plaintiff's employment.  As described above, it was Hesse who

brought Mugavero's alleged error to Berkowitz and Wallace-Moore's attention, and it was Hesse who selected the excerpts of the patient's medical chart that Mugavero was permitted to see during the investigatory intervention.  (See supra pp. 10, 16)  Indeed, Berkowitz testified that she placed Mugavero on leave "as a result" of what Hesse told her about Mugavero's treatment of the pregnant patient on October 1, 2002.  (Tr. 269:10-12)  Neither Wallace-Moore nor Berkowitz have a medical background and both testified that they relied on Hesse for their understanding of the medical issues presented by Mugavero's treatment of the pregnant patient..  (Tr. 65:6-18, 210:1-8, 269:1-7)  Given that Arms Acres allegedly terminated Mugavero because of an alleged medical error, and that Hesse provided the information concerning that alleged medical error to the purported decisionmakers – Wallace-Moore and Berkowitz – it was not unreasonable for the jury to find that Hesse played a "meaningful role" in the decision to place Mugavero on leave and terminate her employment.[12]

### B.     Mugavero's Claim Concerning Administrative Leave

Defendants argue that in any event, they are entitled to judgment as a matter of law with respect to Mugavero's administrative leave claim on the ground that Mugavero failed to show that being placed on administrative leave with pay was a materially adverse action.  (Def. JMOL Br. at 11)  Citing Joseph v. Leavitt, 465 F.3d 87

---

[12] In light of the evidence concerning Hesse's role in the investigation, Defendants' argument that the investigation was "independent" (Def. JMOL Br. at 6-9) is unavailing. Moreover, while Defendants emphasize that Mugavero's description of the general procedure for treating pregnant patients matched Hesse's (id. at 7), the only basis Mugavero had for explaining the particular error at issue was the excerpts of the medical charts selected by Hesse, and Mugavero testified that these excerpts were insufficient for her to recall what had happened.  (See supra p. 21)  A rational jury could have concluded from this evidence that, based on Hesse's input, Mugavero was denied a meaningful opportunity to respond to the allegations against her.

(2d Cir. 2006), Defendants argue that the jury could not find in Plaintiff's favor on this issue unless it found that Mugavero "establish[ed that] it was an unreasonable deviation from Arms Acres' regular policies and procedures to place her on administrative leave with pay." (Def. JMOL Br. at 12) Defendants assert that Plaintiff did not offer sufficient evidence to support such a finding. (Id. at 12-13)

The jury, however, was instructed on the requirement that Mugavero must prove a material adverse action, and Defendants neither objected to that instruction nor proposed a more specific instruction. (See Docket No. 86 (Defendants' Proposed Jury Charge) at 5; Tr. 1966:16-1967:7 (materiality instruction); see also Tr. 1692-1713 (charge conference, where Defendants raised no objection), 1988:2-4 (Defendants stating they had no objection after jury was charged)) The jury is presumed to have followed the Court's instruction and to have found that the placement of Plaintiff on administrative leave with pay was a materially adverse action. See Britt v. Garcia, 457 F.3d 264, 272 (2d Cir. 2006).

In any event, Leavitt provides no basis for overturning the jury's verdict. In that case, the Second Circuit held that placement on administrative leave with pay in the discrimination context is not a "materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." Id. at 91. Here, neither side offered evidence as to whether placing an employee on administrative leave with pay was – under the circumstances – normal procedure under Arms Acres' disciplinary policies. Even if such evidence had been offered, however, there was sufficient evidence for the jury to find that Defendants' actions were unreasonable. Defendants did not offer any explanation as to why they

placed Mugavero on leave during the investigation of her alleged error with respect to a pregnant patient in October 2002, but had not placed her on leave during investigations of previous alleged errors – e.g., those detailed in the July 25, 2002 draft warning. (See JX 62) In addition, Mugavero was not told why she was being placed on leave, and indeed was not given any information concerning the particular patient at issue until the second and final investigative interview with Beverly Berkowitz. Even then, Berkowitz shared with Mugavero only a portion of the relevant medical records. (See supra p. 21) On this factual record, the jury could reasonably have concluded that Defendants' placement of Mugavero on administrative leave in October 2002 was not merely due to the reasonable enforcement of pre-existing policies.

### C. Hesse's Liability for the Administrative Leave and Termination Retaliation Claims

Hesse argues that he is entitled to judgment as a matter of law on Mugavero's retaliation claims concerning her termination and placement on administrative leave. (Def. JMOL Br. at 15-17) The jury found Hesse liable for these claims under a state law aiding-and-abetting theory. (Tr. 2018:12-2019:3, 2019:20-2020:16) That finding was supported by the evidence.

If an employer's liability has been established under the NYSHRL, an individual employee may be liable under Section 296.6 of the NYSHRL for aiding and abetting the employer's violation if he "actually participate[d] in the conduct giving rise to [the claim]." Feingold, 366 F.3d at 157 (internal quotation omitted); see also Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999) ("[B]efore an individual may be considered an aider and abettor" under the NYSHRL, the employer's liability "must first be established."). As described above, Hesse's

participation in Arms Acres' investigation of Plaintiff's conduct in October 2002 was sufficient for the jury to find that his retaliatory animus tainted the decision to place Plaintiff on administrative leave and terminate her employment. (See supra p. 21) Thus, the jury could reasonable have found Hesse liable under an aiding-and-abetting theory.

### D. Mugavero's Claim Concerning the OPD Complaint

#### 1. Defendants Are Not Entitled to a New Trial

Defendants argue that they are entitled to a new trial on Mugavero's retaliation claim concerning Hesse's report to the OPD because that report cites the same alleged errors discussed in Mugavero's second written warning, and the jury found that Arms Acres proved its affirmative defense with respect to that warning – i.e., the jury found that Arms Acres would have given Mugavero a written warning concerning the alleged errors regardless of any retaliatory motive. (Def. New Trial Br. at 3-6) The jury might rationally have found, however, that there is a material difference between giving an employee a written warning – which at most could lead to the termination of employment – and asking the state licensing authority to investigate the employee for professional misconduct, which could result in the employee losing not only her job but her licenses as well.

Thus, the jury could reasonably have found that while Arms Acres would have disciplined Mugavero for the incidents listed in the second written warning absent any retaliatory motive, Hesse would not have taken the further step of reporting her to the OPD absent such a motive. Such a conclusion would have been supported by the language of the written warning and the letter to the OPD: as discussed above (see supra pp. 13-15), the jury could have found that the OPD letter was drafted to make Mugavero's conduct appear worse than it was. Many of Hesse's most inflammatory

allegations were not included in the warning.  (<u>Compare</u> JX 109 (OPD letter) <u>with</u> JX 62 (second written warning))  The warning, for example, did not refer to an "increasing pattern of [] errors," "acts of incompetence or negligence," "abandonment or neglecting a patient," "intentional[] failure to correct an error, or "a callous indifference for [] patient[] safety and her professional responsibilities," nor did it state that Mugavero had "not accepted supervision."  (<u>Compare</u> JX 109 (OPD letter) <u>with</u> JX 62 (second written warning))

For all of these reasons, the Court cannot find that the jury's liability verdict with respect to the OPD retaliation claim was against the weight of the evidence.

## 2. Arms Acres Is Not Entitled to Judgment as a Matter of Law

Arms Acres argues that it is entitled to judgment as a matter of law on the OPD retaliation claim because it "did not review, approve or condone [the OPD complaint] in any way" and because Hesse "acted solely in his capacity as Plaintiff's collaborating physician when he filed his complaint."  (Def. JMOL Br. at 13-14) Because neither the law nor the evidence supports Arms Acres' argument, it is not entitled to judgment as a matter of law on this claim.

First, a company is ordinarily vicariously liable for the unlawful retaliatory actions of its high-level executives.  <u>See, e.g.</u>, <u>Abreu v. Suffolk County Police Dep't</u>, No. 3 Civ. 5927 (JFB)(WOW), 2007 WL 608331, at *12 (S.D.N.Y. Feb. 23, 2007); <u>Muraj v. UPS Freight Servs.</u>, No. 04 Civ. 6563 (CJJ), 2006 WL 2528538, at *2 (W.D.N.Y. Aug. 31, 2006); <u>Dawson v. County of Westchester</u>, 351 F. Supp. 2d 176, 187-89 (S.D.N.Y. 2004).  Arms Acres offers no case law support for its theory that a company

can avoid vicarious liability by identifying some independent statutory obligation that a manager asserts supports his decision to take retaliatory action.

Second, Mugavero offered evidence refuting Arms Acres' factual contentions that it "did not review, approve or condone [the complaint] in any way" and that Hesse did not make the complaint on Arms Acres' behalf. (Def. JMOL Br. at 13-14) Wallace-Moore's notes from her meetings with Hesse show that Hesse told her that he intended to report Plaintiff to the OPD before he filed the written complaint (JX 40 at Bates 506), and there was no evidence that Wallace-Moore disagreed with or attempted to dissuade Hesse from pursuing that course of action. Thus, the jury could reasonably have inferred that Wallace-Moore implicitly approved of Hesse's decision. The jury also could have inferred from the language of Hesse's letter to the OPD that, while he was Mugavero's "supervising physician in NY state," he was acting on behalf of Arms Acres. On the cover sheet of the complaint form, Hesse listed Arms Acres as his address, and he reported in the complaint that "[w]e have completed investigation and discipline" for the incidents listed in the letter. (JX 109 at Bates 2186-87) (emphasis added).

## III.    DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL ON THEIR AFTER-ACQUIRED EVIDENCE DEFENSE

Defendants have also moved for a new trial on their after-acquired evidence defense, arguing that the jury's failure to find in their favor with respect to this defense is against the weight of the evidence. (Def. New Trial Br. at 7-19) There is no basis to order a new trial on this issue.

### A.    The After-Acquired Evidence Doctrine

The Supreme Court has held that "evidence that the employee would have been terminated for lawful reasons will make certain remedies, such as reinstatement and

front pay, unavailable," Greene v. Coach, Inc., 218 F. Supp. 2d 404, 412 (S.D.N.Y. 2002) (citing McKennon v. Nashville Banner Pub'g Co., 513 U.S. 352, 362 (1995)), and that an award of back pay would properly "be limited [ in such cases] to salary lost from the date of the unlawful discharge until the date the employer discovered the information which would have led to discharge on lawful grounds," Flores v. Buy Buy Baby, Inc., 118 F. Supp. 2d 425, 432-33 (S.D.N.Y. 2000) (citing McKennon, 513 U.S. at 361-62). To show that a plaintiff's damages should be limited under this theory, "an employer must establish that the wrongdoing was of such severity that the employee would have been terminated on such ground alone if the employer had known of it at the time of discharge." Greene, 218 F. Supp. 2d at 412 (emphasis added). It is not enough for the employer to show that the employee's misconduct could have been sufficient grounds for termination; the employer must show that the misconduct "would actually [have been a] . . . basis for termination." Greene, 218 F. Supp. 2d at 413 (emphasis added).

### B. The Evidence At Trial

The evidence demonstrated that Mugavero took notes on confidential patient records for use in this litigation and surreptitiously recorded her interviews with Berkowitz in October 2002. (See infra pp. 28-29) Wallace-Moore testified that had she known of this conduct, she would have terminated Mugavero's employment. (Tr. 1810:25-1811:3) Therefore, in accordance with the above-cited case law, the Court instructed the jury that it should not award lost wages and fringe benefits for the period after April 15, 2004, if it found "that Arms Acres would have terminated plaintiff's employment if it had known of her taking notes on medical charts for personal use," and should not award such damages for the period after August 13, 2004, if it found "that Arms Acres would have terminated plaintiff's employment if it had known of her tape

recording, or because of the combination of the tape recording and note taking."[13] (Tr. 1980:23-1981:7)

### 1. <u>Plaintiff's Conduct</u>

The evidence concerning Mugavero's alleged misconduct consisted of the following:

- <u>Notes concerning patient treatment</u>: Mugavero testified that she took notes on approximately six or seven patients' medical charts that she believed showed "the same acts of not doing things appropriately" or "worse [acts]" than what she had allegedly done. (Tr. 1320:19-25) She began taking these notes in May 2002 when Hesse began conducting frequent supervision meetings with her. (Tr. 1281:2-5) The notes consisted of "little scraps of paper" on which she wrote patients' "initials" and "unit number[s]," and also "jot[ted] . . . a diagnosis . . . so . . . [she] could remember what it was about." (Tr. 1277:20-1278:2) For example, Mugavero's notes about one patient concerned a lab report that addressed the patient's hemoglobin and hematocrit levels. (Tr. 1310:15-24) Mugavero gave these notes to her attorney for use in this litigation. (Tr. 1295:3-5, 1298:1-2)

- <u>Recording of investigative interviews</u>: Mugavero surreptitiously tape-recorded the two investigative interviews in October 2002, which included discussion of the pregnant patient's name, medical condition, and treatment.

---

[13] Defendants objected to this instruction to the extent it required the jury to find that Arms Acres would have terminated Plaintiff's employment "on the basis of that misconduct alone." (Tr. 1711:6-1712:16) In their new trial motion, however, Defendants do not argue that this instruction was erroneous.

Mugavero provided these tapes to her attorney. (Tr. 1137:20-1138:17,

1147:3-8, 1148:15-1149:8 (second interview))

- <u>List of other pregnant patients</u>: While Mugavero was at Arms Acres for one

   of her investigative interviews, an Arms Acres employee gave her a piece of

   paper with patients' first or last names, unit numbers and an indication that the

   patient had a positive pregnancy test. (Tr. 1287:1-1288:6) Perhaps two of the

   patients were identified by first and last name. (Tr. 1288:7-8)[14]

## 2. **Whether Plaintiff Violated Arms Acres' Policies**

Arms Acres offered evidence that it had numerous policies in place to

protect patient confidentiality. These policies prohibited the disclosure of patient-

identifying information to anyone outside Arms Acres and the disclosure of such

information for any purpose other than treating the patient. (See, e.g., JX 3 at Bates 572

(Arms Acres Code of Ethics, stating that employees "have the responsibility to . . .

[r]espect patient's right to privacy and to protect the confidentiality of the patient and of

all information obtained in the course of professional service"); JX 4 (Confidentiality

Policy, stating: "It is Arms Acres' policy that the identity or any information regarding a

patient will not be disclosed outside the facility without the appropriate release forms.

---

[14] Mugavero also testified that after her employment was terminated, McArdle gave her the first name, last initial and unit number for a few patients, so that Mugavero could attempt to subpoena these patients' records for use in this litigation. (Tr. 1290:24-1291:22) This evidence could not properly have been considered by the jury in support of Arms Acres' after-acquired evidence defense, however, because the jury was instructed – without objection from Defendants – that only misconduct that occurred "during the course of . . . [Mugavero's] employment" was relevant to the after-acquired evidence defense. (Tr. 1980:5-11; see also Tr. 1711:6-1712:16, 1988:2-4)

Confidential patient information will be discussed or shared within the facility only for the purposes of patient treatment."))

Wallace-Moore testified that Mugavero's sharing of recorded confidential patient information with her attorney was "the worst [violation of confidentiality policies] that had occurred" in Wallace-Moore's tenure at Arms Acres, and was "definitely a pretty . . . egregious act." (Tr. 1810:22-24) The testimony of other Arms Acres employees, however, did not fully support Wallace-Moore's statement that Mugavero's conduct clearly violated Arms Acres' confidentiality policies. Mugavero's co-workers testified that unless the patient could be identified – for instance, because the patient's full name was disclosed – they would not understand Arms Acres' confidentiality policies to have been breached. (Tr. 1428:17-25 (DeMarco testimony), 1488:14-21 (Umali testimony), 1531:16-1532:3 (Herzenberg testimony)) As described above, the evidence suggested that Mugavero had disclosed to her attorney the full names of, at most, two or three patients.

### 3.    Evidence That Arms Acres Would Have Terminated Plaintiff's Employment

Arms Acres' evidence that it would have fired Mugavero for disclosing patient information consisted of Wallace-Moore's testimony that, had she known about Plaintiff's acts during her employment, "[Mugavero] would have been terminated immediately." (Tr. 1810:25-1811:3) Weighing against this evidence was: (1) Wallace-Moore's admission that no employee had ever been fired for disclosing patient identifying information (Tr. 1816:13-22); and (2) documents offered by Mugavero showing that at least four Arms Acres employees had violated Arms Acres'

confidentiality policies by disclosing patient identifying information to individuals outside the facility, but had not been fired (PX 17 (Interrogatory #20 at Bates 2152-55).[15]

This Court cannot conclude that the jury's resolution of this issue was "against the weight of the evidence" and constituted a "seriously erroneous result." Manley, 337 F.3d at 245 (internal quotation omitted).  Given that Arms Acres had no record of firing employees for breaches of confidentiality, the jury's verdict on this issue turned on the jury's assessment of Wallace-Moore's credibility.  The jury could reasonably have concluded – despite Wallace-Moore's testimony – that Mugavero's violation of Arms Acres' confidentiality policies was relatively limited and would not have resulted in any different discipline than that received by other employees who had violated those policies.  Considering the entirety of the evidence, it would not have been "seriously erroneous" for the jury to find that Arms Acres had not proven that it would "actually" have terminated Mugavero on the basis of her tape-recording and/or her note-taking.  Greene, 218 F. Supp. 2d at 412.  Therefore, Arms Acres is not entitled to a new trial on this issue.

---

[15]  Defendants argue that the jury could not properly have considered the evidence concerning other employees because their breaches were not of comparable seriousness. (Def. New Trial Br. at 17)  This evidence was received without objection, however, and the jury was thus permitted to give it whatever weight it deserved.  Moreover, Defendants' case citations concerning when employees can be considered "similarly situated" for purposes of establishing disparate treatment are not on point.  (See Def. New Trial Br. at 15)  Nothing in these cases suggests that it was wrong for the jury to consider Arms Acres' response to less serious misconduct in assessing Wallace-Moore's claim that she would have fired Mugavero had she known of Mugavero's misconduct.

## IV.   DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL AS A DISCOVERY SANCTION BUT ARE ENTITLED TO REASONABLE ATTORNEYS' FEES AND COSTS

Defendants argue, pursuant to Fed. R. Civ. P. 37 and the Court's inherent powers, that they are entitled to a new trial because Mugavero and her counsel withheld – during discovery – the notes Mugavero took of Arms Acres patients' medical records. Arms Acres claims that Plaintiff's abuse of the discovery process undermined Arms Acres' preparation of its after-acquired evidence defense. Alternatively, Defendants argue that Mugavero and her attorney should reimburse Arms Acres for attorneys' fees and costs it incurred in addressing Mugavero's discovery abuses.  (Def. Sanctions Br. at 2)  While Defendants present no evidence of prejudice sufficient to warrant a new trial, they are entitled to discovery sanctions in the form of attorneys' fees and costs for intentional discovery abuses discussed in this Court's June 30, 2009 Order.

In that Order, this Court found that Plaintiff and her counsel had intentionally withheld notes Mugavero had made of Arms Acres patients' medical records:

> Plaintiff should have produced her notes [concerning the treatment of the patients whose charts she requested] in response to Defendants' initial discovery requests . . . which were served on February 23, 2004 and require[d] Plaintiff to:  (1) "[i]dentify all documents, including . . . notes, . . . maintained . . . by Plaintiff relevant to or which would tend to lead to the discovery of relevant information concerning the allegations in each paragraph of Plaintiff's Complaint," and (2) produce documents supporting her claims. . . . If the notes did not exist in April 2004 when Plaintiff responded to Defendants' discovery requests, or in January 2005 when her deposition was taken, Plaintiff should have produced them in the ordinary course of discovery pursuant to her duty to supplement her discovery responses.

(6/30/09 Order at 2-3)  The Court also found that "Plaintiff offered no valid reason for her failure to disclose her notes," and that "as of March 16, 2005, Plaintiff's counsel was

aware that Plaintiff's notes existed, but <u>deliberately</u> chose not to disclose them to

Defendants."  (<u>Id</u>. at 3-4 (emphasis added))  After precluding Plaintiff from offering or

utilizing the aforementioned notes at trial, the Court denied Defendants' request for

sanctions without prejudice to renewal after a Court-ordered deposition of Plaintiff

concerning this issue.  (<u>Id</u>. at 5)

### 1. Whether Arms Acres is Entitled to a New Trial

Defendants argue that they should be granted a new trial because

Mugavero's failure to produce her notes "thwarted Defendants' preparation of their after-

acquired evidence defense."  (Def. Sanctions Br. at 2)  The cases cited by Defendants

(Def. Sanctions Br. at 13 n. 10), however, are inapposite, as they involve significantly

more egregious conduct than failing to produce documents.[16]  <u>See</u> <u>Miller v. Time Warner</u>

<u>Communications, Inc.</u>, No. 07 Civ. 7286, 1999 WL 739528 (S.D.N.Y. Sep. 22, 1999)

(complaint dismissed when plaintiff admitted that she had attempted to destroy certain of

her handwritten notes to prevent their discovery by defendants, and court found that

plaintiff and her counsel both committed perjury at the spoliation hearing); <u>Lipin v.</u>

<u>Bender</u>, 193 A.D.2d 424, 597 N.Y.S.2d 340 (1st Dep't 1993) (affirming dismissal of

complaint where plaintiff surreptitiously took defendants' counsel's notes and summaries

---

[16]  The Court does not condone Mugavero's failure to produce the notes during discovery and indeed sanctioned Mugavero by prohibiting her from (1) offering the notes as evidence at trial; (2) utilizing them in questioning witnesses at trial; (3) offering deposition testimony that she obtained using the information in the notes; and (4) disputing that Defendants had knowledge of the notes as of April 15, 2004, the date Plaintiff first responded to Defendants' discovery requests (and the date by which Plaintiff should have produced the notes)."  (6/30/09 Order at 5)  Defendants' arguments concerning the importance of the notes to their after-acquired evidence defense, however, are undermined by their admission that they suspected the existence of such notes as early as Hesse's deposition in 2005, but failed to press for further discovery until a few weeks before the July 2009 trial.  (Def. 6/1/09 Letter at 19-21).

of witness interviews off table during a discovery conference and copied them for her own use).

Most importantly, Defendants received the notes prior to trial and have not identified any way in which they were prejudiced in presenting their after-acquired evidence defense. Absent such prejudice, Mugavero's discovery misconduct does not warrant a new trial.

### 2. Whether Defendants are Entitled to an Attorneys' Fee Award

Defendants argue that they are entitled to an attorneys' fee award because Plaintiff's and Plaintiff's counsel's discovery abuses caused them to incur "significant expenses," including writing five letters to this Court concerning the undisclosed information, taking Mugavero's videotaped deposition on July 6, 2009, and briefing the instant motion for sanctions. (Def. Sanctions Br. at 12)

Rule 37 "provides a spectrum of sanctions" for discovery abuses, "[t]he mildest [of which] is an order to reimburse the opposing party for expenses caused by the failure to cooperate." Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1066 (2d Cir. 1979); see also Aetna Life Ins. Co. v. Licht, No. 03 Civ. 6764, 2005 WL 180873, at *1 (S.D.N.Y. Jan. 27, 2005). This rule "places the burden on the disobedient party to avoid expenses by showing that his failure is justified or that special circumstances make an award of expenses unjust," and "expenses should ordinarily be awarded unless a court finds that the losing party acted justifiably in carrying his point to court." 1970 Advisory Committee Notes. Numerous district court opinions make clear that the losing party on a motion to compel generally "must pay reasonable expenses, barring extenuating circumstances." Creative Res. Group of New Jersey, Inc. v. Creative Res. Group, Inc., 212 F.R.D. 94, 103 (E.D.N.Y. 2002) (emphasis

in original).  see also, In re Omeprazole Patent Litig., No. M-21-81, No. MDL 1291, 2005 WL 818821 at *15 (S.D.N.Y. Feb. 18, 2005); Envirosource, Inc. v. Horsehead Res. Dev. Co., 981 F. Supp. 876, 880 (S.D.N.Y. 1998); Fund Comm'n Serv., II, Inc. v. Westpac Banking Co., No. 93 Civ. 8298, 1996 WL 469660, at *5 (S.D.N.Y. Aug. 16, 1996).

This Court may also impose discovery sanctions "under its inherent power to manage its own affairs," and where the "breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction." Residential Funding Corp. v. Degeorge Fin. Corp., 306 F. 3d 99, 106-07 (2d Cir. 2002). Unlike Rule 37, which does not require bad faith for the imposition of sanctions, when a court acts under its inherent powers a showing of bad faith is required. There must be "clear evidence" that the challenged actions "are entirely without color" and that they were taken for "reasons of harassment or delay or for other improper purposes." United States v. International Brotherhood of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991); see also DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 136 (2d Cir. 1998).

The Court's June 30, 2009 finding that Plaintiff's counsel deliberately failed to produce notes that were responsive to Defendants' discovery requests amounts to a finding of bad faith, and thus this Court can impose sanctions according to both its inherent powers and Rule 37. The Court has broad discretion in determining whether and in what manner to impose sanctions. See Aetna Life Ins. Co., 2005 WL 180873, at *1; Ashkinazi v. Sapir, 02 Civ. 002, 2005 WL 937597, at *4 (S.D.N.Y. Apr. 20, 2005). Given that Plaintiff has offered no valid reason for her failure to disclose her handwritten

notes, and that Plaintiff's counsel intentionally failed to produce these notes although she knew of them prior to March 16, 2005, Defendants are entitled to sanctions in the form of <u>reasonable</u> attorneys' fees and costs associated with (1) this sanctions motion; (2) certain correspondence with this Court concerning this issue (<u>see</u> Defendants' letters of June 1, 2009, June 15, 2009, June 18, 2009, and June 19, 2009); and, (3) <u>one</u> lawyer taking Plaintiff's deposition on July 6, 2009. [17]  The amount of attorneys' fees and costs awarded to Defendants will be addressed in a separate opinion addressing attorneys' fees as a whole.

"Sanctions imposed pursuant to . . . Rule 37(a) may be imposed upon either the attorney or the party or both. . . ."  <u>Imperial Chems. Indus., PLC v. Barr Labs., Inc.</u>, 126 F.R.D. 467, 473 (S.D.N.Y. 1989); <u>see also</u> 7 <u>Moore's Federal Practice</u> § 37.23[4][a].  Given that the relative culpability of Plaintiff and her counsel in perpetrating these discovery abuses is not clear, Plaintiff and Plaintiff's counsel will be held equally liable for the attorneys' fee award ultimately imposed.

## V.     COMPONENTS OF THE COMPENSATORY DAMAGES AWARD WILL BE VACATED

Defendants have moved for vacatur of or a reduction in the compensatory damages award.  (Def. Damages Br. at 7-23)  Because there is no evidence that Plaintiff suffered emotional distress as a result of being placed on administrative leave, the $75,000 award arising from that claim will be vacated.  Similarly, the lost wages award must be reduced by $46,526.05, representing five and a half months during which

---

[17]  Arms Acres likewise should not be required to pay Mugavero's attorneys' fees and costs related to addressing these discovery abuses.  The Court will reduce Plaintiff's attorneys' fee award to address this issue.

Plaintiff concededly was not available to work. Finally, as discussed below, Plaintiff offered evidence justifying no more than $11,658.22 of her lost fringe benefits award. To the extent the award exceeds that amount, it will be vacated. The compensatory award will otherwise not be disturbed.

A. **Emotional Distress Damages**

The jury awarded Mugavero a total of $250,000 as compensation for emotional distress – $75,000 relating to the OPD complaint, $75,000 relating to being placed on administrative leave, and $100,000 relating to the termination of her employment. (Tr. 2021:8-23) Defendants argue that these awards were excessive in light of the evidence offered at trial, and assert that the award should be remitted to "no more than $50,000." (Def. Damages Br. at 23)

A compensatory award may be based on testimonial evidence alone and "is not preconditioned on whether [the plaintiff] underwent treatment, psychiatric or otherwise." Jowers v. DME Interactive Holdings, Inc., No. 00 Civ. 4753, 2006 WL 1408671, at **3, 12 (S.D.N.Y. May 22, 2006). Damages for emotional distress, however, cannot be assumed simply because retaliation has occurred. See McIntosh v. Irving Trust Co., 887 F. Supp. 662, 665 (S.D.N.Y. 1995) ("If the Court were to accept the evidence introduced at trial as sufficient to support the jury's award for compensatory damages, it would, in effect, be establishing a per se rule that once a defendant is found liable for unlawful retaliation, the plaintiff is entitled to damages for mental anguish. However, such a rule has been rejected."); Fowler v. New York Transit Auth., No. 96 Civ. 6796, 2001 WL 83228, at *10 (S.D.N.Y. Jan. 31, 2001); Northern Orchard Co. v. State Div. of Human Rights, 161 A.D.2d 846, 847 (N.Y. App. Div. 3d Dep't 1990) ("damage may not be presumed because of the nature of the discrimination itself").

Instead, "there must be evidence of the effect of the discrimination upon complainant, the nature and duration of her condition and its severity." Id.

### 1.     **Placement on Administrative Leave**

Although Mugavero was required to adduce evidence establishing emotional distress related to the specific act of being put on administrative leave on October 1, 2002, she offered no such testimony. Plaintiff's counsel did not question Mugavero on this subject. While there was evidence that Plaintiff told Berkowitz that being placed on administrative leave was "disheartening," and that Arms Acres' action was "harassing and inappropriate" (Pltf. Damages Br. at 18 (citing JX 73, 74 (audio recordings of telephone conversations between Mugavero and Berkowitz))), this evidence does not establish that Mugavero suffered actual emotional injury as a result of being placed on administrative leave. Plaintiff's expert, Dr. Weinshel, testified that Mugavero was under "great stress at work" and "that [Mugavero] was steadfast in her belief that she had done nothing wrong, that she was being railroaded, that a case was being made to try to get rid of her, and that in the end, she was let go." (Tr. 344: 7-8, 345: 14-19) This evidence, however, likewise does not establish that Mugavero suffered emotional distress resulting from being placed on administrative leave.

Because there was no factual basis for the jury to compensate Mugavero for emotional distress resulting from being placed on administrative leave, the $75,000 award on this claim must be vacated.[18]

---

[18] The cases cited by Plaintiff are not to the contrary. In those cases, the plaintiffs and other witnesses described the emotional distress associated with specific actions of their employers. Bogle v. McClure, 332 F.3d 1347, 1359 (11th Cir. 2003) ("When describing their emotional harm, the [plaintiffs] testified the transfers 'upset,' 'embarrassed,' 'humiliated,' and 'ashamed' them. Some Librarians testified the transfers caused them to

## 2. __OPD Investigation__

Defendants argue that Mugavero failed to offer any evidence that she suffered emotional distress as a result of the OPD investigation. (Def. Damages Br. at 18-19) At trial, however, Mugavero testified about how "what happened to [her] at Arms Acres" affected her emotionally and stated that the OPD investigation "affected [her] the most because [Arms Acres] tried to take away my livelihood, and my career." (Tr. 761: 17-762: 5) Mugavero also introduced medical records showing that on January 14, 2003, shortly after the OPD investigation began in December 2002, she reported to her physician that she was experiencing anxiety and significant insomnia "because of some professional conduct issues, which she indicate[d] are false," and was prescribed anti-anxiety medication. (PX 16; see also Tr. 337:4-14) This evidence is sufficient to support an award of emotional distress damages with respect to the OPD investigation.[19]

---

become depressed and one even became suicidal."); Brown v. Lester E. Cox Med. Ctrs., 286 F.3d 1040, 1046 (8th Cir. 2002) (awarding damages for emotional distress where "both [plaintiff] and her daughter testified about the embarrassment and demoralization Brown suffered as a [direct] result of the reassignment"). While Mugavero described the "disheartening" and "inappropriate" nature of the administrative leave action, she did not testify about the emotional impact of that determination on her.

[19] Defendants argue that because Mugavero conceded at trial that she had failed to offer evidence of special damages concerning her prima facie tort claim associated with Hesse's report to the OPD – an omission that led to the dismissal of that claim (Tr. 1828: 4-6) – Mugavero's claim for emotional distress damages arising from the OPD report must likewise be dismissed. (Def. JMOL Br. at 20) Defendants are incorrect, because one inquiry has nothing to do with the other. The fact that Mugavero did not establish special damages in connection with her prima facie tort claim – i.e., out of pocket losses – has nothing to do with whether she offered evidence of emotional distress arising from the OPD report.

### 3.  Remittitur of the Emotional Distress Award for Plaintiff's Discharge Is Unwarranted

Defendants also argue that "[t]he $100,000 compensatory damages award for emotional distress relating to Plaintiff's retaliatory discharge claim should be remitted based on the short duration of the emotional distress Plaintiff experienced as a result of her termination and the amount of damages that have been awarded for similar injuries in comparable cases."  (Def. Damages Br. at 20)  "Remittitur is appropriate to reduce verdicts only in cases 'in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.'"  Werbungs und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991) (internal citation omitted).  "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages."  Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990).  To determine whether the compensatory damages award here is so high as to "shock the judicial conscience," the Court must "'consider[] the amounts award[ed] in other, comparable cases.'"  DiSorbo, 343 F.3d at 183 (quoting Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997)).

"When considering whether . . . [the] award falls within a reasonable range," however, the Court "do[es] not 'balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater.'"  Id. (quoting Ismail, 899 F.2d at 187).  Where, as here, the argument for remittitur is that the award is "intrinsically excessive," but the excess is "not attributable to a discernable error," the Court may "reduce the award 'only to the maximum amount that would be upheld . . . as not excessive.'"  Rangolan v. County of Nassau, 370 F.3d 239, 244 (2d Cir. 2004) (internal citations omitted).  Thus, the Court will "not reduce [the] verdict to less

than the <u>maximum</u> previously held to be reasonable for injuries of similar severity."  <u>Id.</u> at 247 (emphasis added).

Defendants argue that the emotional distress award of $100,000 for Mugavero's termination is excessive.  Recent case law, however, does not support Defendants' argument:

> Emotional distress awards within the Second Circuit can "generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'"  In "garden variety" emotional distress claims, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury."  Such claims typically lack "extraordinary circumstances" and are not supported by any medical corroboration.  "Garden variety" emotional distress claims "generally merit $30,000 to $125,000 awards."
>
> "Significant" emotional distress claims "differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses."

<u>Olsen v. County of Nassau</u>, 615 F. Supp. 2d 35, 46-47 (E.D.N.Y. 2009) (internal citations omitted).  <u>Rainone v. Potter</u>, 388 F. Supp. 2d 120 (E.D.N.Y. 2005), cited by Defendants, sets forth a substantially lower range for garden-variety emotional distress claims than more recent cases.  <u>Olsen</u>, 615 F. Supp. 2d at 46 n.4; <u>see also</u> <u>Watson v. E.S. Sutton, Inc.</u>, No. 02 Civ. 2739, 2005 WL 2170659, at *16 (S.D.N.Y. Sept. 6, 2005) (surveying cases and concluding that "[t]he range of acceptable damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000").

Here, Mugavero offered evidence of more than a "garden-variety" emotional distress claim: she testified that her emotional distress from being terminated had specific consequences in the form of increased anxiety and insomnia, at least during the period from August 2002 through January 2003, and provided corroborating medical evidence. (Tr. 335-338, 661-62; JX 84; JX 85) Moreover, as discussed throughout this opinion, the conduct here went far beyond typical discipline imposed in the workplace, and threatened Plaintiff's ability to earn a living and practice her profession. Given that Hesse's action was "more offensive conduct" than is commonly seen in a "garden-variety" case, neither the emotional distress award of $100,000 for Mugavero's termination nor the total emotional distress award of $175,000 shocks the conscience or is excessive.

**B.**     **A Reduction In the Award for Economic Damages Is Appropriate**

The jury awarded Plaintiff compensatory damages for economic injury in the amounts of $468,183 in back pay and $46,000 in fringe benefits. (Tr. 2021: 24-45; 2022: 1-2) Defendants argue that these awards should be reduced because of Plaintiff's failure to (1) mitigate her economic damages, and (2) provide documentary evidence supporting her entitlement to fringe benefits. (Def. Damages Br. 7, 11-12) Plaintiff's award of economic damages for lost wages and fringe benefits will be reduced as explained below.

**1.  The Lost Wages Award Must be Reduced for Time Periods During which Plaintiff Was Unable to Work**

The Court instructed the jury that Mugavero would not be entitled to damages for lost wages or benefits for periods of time in which "she was unable or

unwilling to work for personal reasons."[20]  (Tr. 1979:12-17)  Defendants argue that the jury erred by including in Mugavero's award lost wages for periods of time Plaintiff was admittedly unable or unwilling to work.  (Def. Damages Br. 7)  Defendants are correct that Plaintiff is not entitled to damages for the periods between February 25, 2003 and May 10, 2003, when she visited her sister in North Carolina, and December 2003 and March 2004, when she was recuperating from knee replacement surgery.  Defendants otherwise have not demonstrated that Mugavero failed to mitigate her damages between October 25, 2002, when she was fired, and late 2007, when she regained full-time employment.

Mugavero testified that during the 2.5 month period she was visiting her sister in North Carolina she did not collect unemployment and told the unemployment office that she was not available for work.  (Tr. 1215:9-25, 1216:13-15; 1217:3-23)  The New York State Department of Labor determined that Mugavero was not entitled to receive unemployment benefits because she was not "ready, willing and able to work." (JX 80)  When asked if Mugavero looked for work during this time period she responded both "I don't recall" and, later, "Yes, I did."  (Tr. 1216:8; 1217:17)  Whether or not Mugavero looked at help wanted ads while in North Carolina has no bearing on the fact that she would not have been able to <u>accept and commence</u> any new position she found

---

[20] <u>See</u> <u>Saulpaugh v. Monroe Comm. Hosp.</u>, 4 F.3d 134, 145 (2d Cir. 1993) (plaintiff was not entitled to back pay for period of disability unless she would have continued to receive her salary during that period had she remained employed); <u>Griffin v. Four Seasons Resorts & Hotels, Ltd.</u>, No. 96-Civ.-4759(JSR), 1999 WL 212679, at *1 (S.D.N.Y. Apr. 12, 1999) ("[A] decision to forego comparable employment for personal reasons [-- in this case, to care for a terminally ill parent in Australia --] . . . however understandable, constitutes a failure to mitigate damages as a matter of law.").

while in North Carolina. Thus, she is not entitled to economic damages for lost wages during this period.

Mugavero also testified that she had knee surgery in December 2003 and took three months to recuperate in Florida. (Tr. 743:24-25, Tr. 1217:24-1218:6, 1219:18-1220:23) During that period of time she ceased her per diem employment at New Milford Hospital and was unable to work. (Id.) Plaintiff's argument that "there was no testimony that she was unable to work until March 2004, or that she was not looking for employment during that period," is insufficient. (Pltf. Damages Br. 13) Plaintiff cites no evidence to contradict the assertion that she was unable to work and was not available in New York to pursue employment during this three-month period. Thus she is not entitled to economic damages for this period.

Plaintiff argues for the first time, however, that "testimony showed Plaintiff's benefits at Arms Acres included long and short term disability as well as sick time," and so "her time while out would have been covered." (Id. (citing Tr. 734-36)) There is no evidence establishing Plaintiff's disability benefits at Arms Acres, however. In any case, Plaintiff claimed that she obtained replacement long-term disability coverage after her termination. (Tr. 736) If Plaintiff had disability coverage during her rehabilitation, she presumably received disability benefits for those three months and thus is not entitled to back pay.

For the foregoing reasons, the jury's award for lost wages must be reduced by $46,526.05, representing 5.5 months of earnings calculated according to Mugavero's

2001 W-2 statement, which records her gross pay at Arms Acres as $101,511.38. (JX 81)[21] Accordingly, Plaintiff's lost wages award is reduced to $421,656.95.

Defendants next argue that Plaintiff failed to mitigate her damages for lost wages for the period between October 25, 2002 – her termination date – and late 2007, when she obtained employment at a maximum security prison in Florida. (Def. Damages Br. 9-10) Defendants, however, have failed to meet their burden of proof on this point, because the record establishes that Mugavero looked for work and took temporary employment during this period except for the 5.5 months discussed above.

"Generally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate. This may be done by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005) (internal citations and quotation marks omitted). The employer, however, is not required to demonstrate comparable employment was available if it can prove the employee made no reasonable efforts at finding employment. Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir.1998). See also Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982) (under Title VII, an employee loses any entitlement to back or front pay if the employer can show she failed to use "reasonable diligence in finding other suitable employment"); Becerril v. East Bronx NAACP Child Dev. Ctr., No. 08 Civ. 10283, 2009 WL 2611950 at **8-9 (S.D.N.Y. Aug. 18, 2009) (holding it

---

[21] Defendants request a reduction of $41,021.93 based on Mugavero's 2002 hourly wage of $43.03. (Def. Damages Br. 8) Because there is no evidence cited for how many hours Mugavero would have worked during the 5.5 month period discussed above, taking a fraction of Mugavero's gross pay from her last W-2 form from Arms Acres provides a more reasonable estimate.

"reasonable and appropriate to conclude that [plaintiff] was reasonably diligent in her search for new employment" where defendant did not submit evidence of its own challenging the sufficiency of plaintiff's mitigation efforts). Defendants' burden to demonstrate insufficient mitigation efforts is substantial:

> [D]efendant's burden of proving a lack of diligence is not satisfied merely by a showing that there were further actions that plaintiff could have taken in pursuit of employment. Rather, defendant must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment. The range of reasonable conduct is broad and the injured plaintiff must be given the benefit of every doubt in assessing her conduct.

EEOC v. Kallir, Philips, Ross, Inc., 420 F. Supp. 919, 925 (S.D.N.Y. 1976); see also Ginsberg v. Valhalla Anesthesia Assocs., P.C., No. 96 Civ. 6462, 1997 WL 669870, at *2 (S.D.N.Y. Oct. 28, 1997); Bonura v. Chase Manhattan Bank, N.A., 629 F. Supp. 353, 356 (S.D.N.Y. 1986). Here, Defendants argue that the evidence submitted by Plaintiff concerning her job search efforts "demonstrates the lack of reasonableness, diligence and results of Plaintiff's alleged mitigation efforts." (Def. Damages Br. 10) Defendants err in placing the burden on Mugavero to prove that her mitigation efforts were sufficient, and offer no independent evidence that Mugavero's conduct "was so deficient as to constitute an unreasonable failure to seek employment." See Bonura, 629 F. Supp. at 356.

Mugavero testified that she looked for jobs repeatedly between her termination date at Arms Acres and 2007 (Tr. 734:3-7, 1260:7-1261:9). She testified that she "looked [for employment] in The New York Times," "in Advance for Nurses, . . . in all of the nursing journals, [and on] the internet," (Tr. 734:3-7), and that she "went on

quite a few interviews" and "constantly sent resumes out" while she was in Florida.  (Tr. 1260:7-1261:9)  Mugavero also offered undisputed testimony that, as a result of her job searches, she actually found and accepted three jobs during this period.  She worked as a per diem nurse at New Milford hospital from August 2003 until December 2003; she then accepted a job as a nurse practitioner and began orientation in early 2005, although she was let go; and, finally, she took a position at a prison in Florida in 2007. (Tr. 743:7-25, 746:1-7, 1217:24-1218:6, 1330:19-1332:5)  The evidence that Plaintiff actually found and accepted three jobs during the 2003 to 2007 time period corroborates her testimony that she was consistently looking for jobs during that time period.  Defendants have failed to prove otherwise.  Accordingly, the award for lost wages will not be further reduced.

### 2. There is Not A Reasonable Basis
### for the Fringe Benefits Award

"'The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination.' The back pay award, therefore, may include lost wages, and anticipated raises and/or fringe benefits." Becerril, 2009 WL 2611950, at *3 (quoting Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 145 (2d Cir. 1993)).  Under New York law, compensatory damages for all economic injury "must be established with reasonable certainty" and "may not be based on pure speculation and conjecture." Kramer v. Showa Denko K.K., 929 F. Supp. 733, 743 (S.D.N.Y. 1996) (collecting cases).  The appropriate amount of lost earnings is typically a jury question. Id.  Defendants argue that Mugavero did "not afford the jury a factual basis to award her damages for lost fringe benefits beyond $10,333.49."  (Def. Damages Br. 11).  Because the entire fringe benefits award is not sufficiently supported by the evidence, it will be reduced as discussed below.

Under New York law, "a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages. He need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork." Sir Speedy, Inc. v. L&P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992). See also Yin Wang v. Yum! Brands, Inc., No. 05-CV-1783, 2007 WL 1521496 at **5-6 (E.D.N.Y. May 22, 2007) (applying the same standard in employment discrimination context). "It [also] is well settled under New York law that the plaintiff's uncorroborated testimony as to the amount of lost past or future wages cannot, as a matter of law, satisfy the 'reasonable certainty' standard." Id. (collecting cases). A plaintiff must submit relevant documentation, such as tax returns or W-2 forms. Id. See also DelValle v. White Castle Sys., Inc., 277 A.D.2d 13, 13-14 (N.Y. App. Div. 1st Dep't 2000) (holding that plaintiff's lost earnings were not established with reasonable certainty where "[t]he award for past and future lost wages . . . was based only on plaintiff's testimony regarding prior employment, unsubstantiated by any tax returns or W-2 forms, and his current employment of less than two weeks").

Here, the evidence offered in support of the fringe benefits award is deficient in two respects. First, Plaintiff has failed to offer sufficient evidence establishing what fringe benefits she received while employed at Arms Acres, and thus what she was entitled to as reimbursement for her out-of-pocket expenses after her termination. Second, Plaintiff has failed to submit receipts, bills or any other reliable

evidence demonstrating that she spent anywhere close to $46,000 on medical, dental, life insurance, or other benefits she may have previously received from Arms Acres.[22]

Neither party introduced documentary evidence at trial detailing the employee benefits Mugavero received while at Arms Acres. Plaintiff introduced the following documentary evidence in support of her fringe benefits claim: (1) receipts for prescription medication purchased for herself and her husband during 2003 and 2004 (JX 82; PX 14); (2) receipts for dental and vision care for herself and her husband during 2003 and 2004 (JX 82); (3) correspondence and billing statements related to COBRA payments made from January 2003 through July 2004 (PX 14); (4) correspondence and billing statements related to the premiums Mugavero paid between July 2003 and December 2004 for the converted health insurance plan she purchased (PX 14); and (4) a bank statement showing that Plaintiff paid a premium for disability insurance in 2004 (Id.). It is a reasonable inference from the evidence of Mugavero's COBRA coverage

_____

[22] In Bonura v. Chase Manhattan Bank, N.A., 629 F. Supp. 353, 361 (S.D.N.Y. 1986), the plaintiff sought reimbursement for out-of-pocket medical expenses he claimed would have been reimbursable under the Defendant employer's health plan. The Court held that the Plaintiff was not entitled to reimbursement because he had failed to carry his burden:

> Upon a proper showing, such expenses would be fully compensable under the Act. However, the only evidence offered by plaintiff in support of his claim was his oral testimony at trial that he had paid certain expenses for his wife's medical care and that those expenses would have been covered by Chase's employee health plan. [Plaintiff] presented no documentation of the expenses he testified he had incurred, nor did he offer any evidence to substantiate his contention that such expenses would have been reimbursable under Chase's group health coverage. Plaintiff's oral testimony, without more, does not establish his entitlement to compensation for the loss he claims.

that – while employed at Arms Acres – she had medical coverage for herself and dental coverage for herself and her husband. The evidence demonstrates that plaintiff was covered under COBRA for 18 months ending July 3, 2004, and that the monthly premium was $422.59. (PX 14) Accordingly, Plaintiff has shown out of pocket losses associated with her COBRA coverage totaling $7606.62. Bills submitted for Plaintiff's individual direct pay plan – which commenced after her COBRA coverage expired – indicate that she paid $460.60 per month for this coverage between July 3, 2003 and December 2004. (Id.) These expenses total $2763.60. Mugavero also introduced bills showing that she paid $1,288 for dental care for herself and her husband after their COBRA coverage expired.[23] (JX 82) Thus there is sufficient evidence in the record demonstrating that Mugavero incurred $11,658.22 in medical and dental expenses that would have been covered under the Arms Acres policy between January 2003 and December 2004.

The prescription drug receipts concerning Plaintiff's husband cannot be considered, because there is no evidence that Plaintiff's husband received prescription drug benefits under the Arms Acres policy. The COBRA coverage provided only individual medical insurance for Plaintiff and thus can only reasonably demonstrate that Plaintiff herself was entitled to prescription drug benefits. As for the receipts bearing Plaintiff's name, any coverage previously provided by Arms Acres was likely covered first by COBRA and then by Plaintiff's direct pay plan. There is no evidence that Plaintiff's benefits decreased under either COBRA or the direct pay plan, resulting in new out-of-pocket prescription expenses. Finally, there is no evidence that Plaintiff or

---

[23] Plaintiff is not entitled to out-of-pocket expenses for dental care while still covered by the COBRA plan, which included dental care. Receipts for services provided before July 3, 2003, are not counted in Plaintiff's entitlement to fringe benefits.

her husband were ever covered by Arms Acres for vision care or long term disability, or that they would have been entitled to reimbursement for these expenses.

Plaintiff cannot obtain damages for fringe benefits that she failed to prove with reasonable certainty she would have been entitled to at Arms Acres. While Plaintiff is correct that much of her testimony on fringe benefits is uncontroverted, she bore the burden at trial of establishing through supporting documentation that she was entitled to an award for lost fringe benefits based on her benefit package at Arms Acres. Defendants' silence does not alter this burden. Accordingly, Plaintiff is only entitled to the COBRA and direct pay health premiums and dental expenses previously discussed. The award for lost fringe benefits will be reduced to $11,658.22, because there was a failure of proof as to any greater amount.

**VI.    ARMS ACRES IS NOT ENTITLED TO
        JUDGMENT AS A MATTER OF LAW OR
        TO A NEW TRIAL ON PUNITIVE DAMAGES,
        BUT IS ENTITLED TO A REDUCTION IN THE AWARD**

Arms Acres argues that the punitive damages award should be vacated or reduced as a matter of law, or that a new trial should be ordered on punitive damages. (Def. JMOL Br. at 17-25, Def. Damages Br. at 2-7)  A plaintiff is not entitled to punitive damages under Title VII[24] unless the employer "engaged in intentional discrimination . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Zimmermann v. Assoc. First Capital Corp., 251 F.3d 376, 384 (2d Cir. 2001) (internal quotation omitted).  Thus, an employer may establish an affirmative

---

[24] Punitive damages are not available for Mugavero's state law claims. Farias v. Instructional Sys., Inc., 259 F.3d 91, 101 (2d Cir. 2001).

defense to a punitive damages claim by showing "both that it had an antidiscrimination policy and made a good faith effort to enforce it." Id. at 385.

The jury found that punitive damages were warranted with respect to just one of Plaintiff's six claims: her retaliation claim based on Hesse's report to the OPD. (Tr. 2022:7-2022:24) Arms Acres argues that this award must be vacated because the Court ruled on summary judgment that Plaintiff could not recover punitive damages for any conduct that occurred after August 6, 2002,[25] and Plaintiff did not offer evidence at trial of pre-August 6, 2002 conduct warranting a punitive damages award. (Def. Br. at 18) Because Hesse engaged in conduct prior to August 6, 2002 that justifies a punitive damages award, this argument has no merit. Arms Acres is, however, entitled to a reduction in the punitive damages award due to the statutory cap of $200,000 applicable under Title VII.

### A. Plaintiff Is Not Barred From Recovering Punitive Damages On Her Claim Concerning the OPD Complaint

Arms Acres argues (Def. JMOL Br. at 18-20) that because Hesse filed his complaint with the OPD on August 19, 2002, and because this Court granted Arms Acres summary judgment on Plaintiff's claim for punitive damages for conduct that occurred before August 6, 2002, Mugavero v. Arms Acres, Inc. et al., No. 03 Civ. 5724 (PGG), 2009 WL 890063, at *23 (S.D.N.Y. Mar. 31, 2009), no punitive damages award may be sustained.

---

[25] As discussed below, at summary judgment, the Court ruled that Arms Acres had established that as of August 6, 2002, it had an anti-retaliation policy in place and had made good faith efforts to enforce it. Mugavero v. Arms Acres, Inc. et al., No. 03-Civ.-5724(PGG), 2009 WL 890063, at *23 (S.D.N.Y. Mar. 31, 2009). Accordingly, the Court ruled that no punitive damages award could be rendered for conduct that occurred after August 6, 2002.

The jury was instructed that it could not award punitive damages "for any conduct that occurred after August 6, 2002." (Tr. 1982:18-24) Because the jury is presumed to have followed this instruction, Britt, 457 F.3d at 272, the Court assumes that it found that Hesse reported Plaintiff to the OPD prior to August 6, 2002. While Defendants introduced into evidence a complaint with a cover sheet dated August 19, 2002 (JX 109), the jury could reasonably have found that Hesse orally reported Plaintiff to the OPD in July or early August. Hesse's draft complaint to the OPD was dated July 25, 2002, and he testified that he spoke to an OPD investigator three or four times during the period from at least "a week before [he] started" drafting the OPD complaint in July "into August." (Tr. 571:20, 574:1-9; see also JX 68 (draft complaint dated July 25, 2002)) Because there is not a "complete absence of evidence" supporting the jury's presumed factual finding that Hesse's initial report to the OPD occurred prior to August 6, 2002, nor "overwhelming" evidence in Arms Acres' favor, Arms Acres is not entitled to judgment as a matter of law on the basis of the Court's summary judgment ruling. Galdieri-Ambrosini, 136 F.3d at 288.

**B.      There is Sufficient Evidence that Arms Acres' Anti-Retaliation Policy Was Not Enforced In Good Faith Prior to August 6, 2002**

Arms Acres has also failed to show that it is entitled to judgment as a matter of law based on the evidence offered at trial. To prevail on its affirmative defense, Arms Acres needed to show "both that it had an [anti-retaliation] policy and made a good faith effort to enforce it." Zimmermann, 251 F.3d at 385. While there was evidence suggesting that Arms Acres had an anti-retaliation provision in its sexual harassment policy, which was in place prior to August 6, 2002 (see Def. Br. at 20-22; JX 5), there

was also evidence indicating that the anti-retaliation provision was not enforced in good faith.

For example, Human Resources Director Berkowitz conceded at trial that Mugavero's letter in support of McArdle's sexual harassment claim was written in good faith, and that Berkowitz was responsible for investigating any allegation of retaliation relating to that letter. (Tr. 242:6-24) Yet both Berkowitz and Wallace-Moore testified that they failed to take any action to address or investigate Mugavero's May 8, 2002 memorandum stating that she believed Hesse was retaliating against her for supporting McArdle's sexual harassment complaint.[26] (JX 61 (memorandum); Tr. 135:4-15, 138:1-139:2, 141:7-142:7, 226:7-229:4) Thus, there was neither a "complete absence of evidence supporting the verdict" in Mugavero's favor on this issue, nor "an overwhelming amount of evidence" showing that Arms Acres enforced its anti-retaliation policy in good faith prior to August 6, 2002. Therefore, Arms Acres is not entitled to judgment as a matter of law on Plaintiff's punitive damages claim. Galdieri-Ambrosini, 136 F.3d at 288.

---

[26] In addition, Mugavero offered testimony from a co-worker supporting the inference that Arms Acres' sexual harassment policy –which contained the anti-retaliation provision (JX 5) – was not widely available. Steven Herzenberg, a physician assistant at Arms Acres from 2000 through at least April 24, 2002 (Tr. 1490:2-3, 1502:6-14 (testifying that he stopped working soon after April 24, 2002)), testified that "if there was [a sexual harassment policy in place during that time], it wasn't enforced." (Tr. 1510:7-16) He also testified that he did not remember ever seeing the sexual harassment policy. (Tr. 1513:10-1514:16)

### C. Plaintiff Offered Sufficient Evidence that Hesse Acted With Malice or Reckless Indifference to Her Federally Protected Rights

Finally, Arms Acres argues (Def. Br. at 23-25) that the punitive damages award should be vacated because Plaintiff did not offer sufficient evidence to show that Hesse reported her to the OPD out of "malice or with reckless indifference to . . . [her] federally protected rights. . . ." Zimmermann, 251 F.3d at 384. Arms Acres asserts that because the alleged misconduct described in the OPD report was also addressed in Plaintiff's second written warning, and the jury found that Arms Acres would have given Plaintiff that warning even absent retaliatory motive, the jury could not reasonably have concluded that Hesse acted maliciously in reporting the same alleged misconduct to the OPD. (Def. Br. at 24)

The jury, however, might reasonably have concluded that giving an employee a written warning and asking the state licensing agency to investigate the employee for misconduct – and to potentially revoke her licenses – are two very different types of actions. Indeed, the jury must have found that Hesse would not have reported Plaintiff to the OPD absent retaliatory motive, because it found that Defendants did not prove their affirmative defense on that claim. (See supra p. 3)

Moreover, as discussed above (see supra pp. 13-15), there was evidence that Hesse did not act in good faith in reporting Mugavero to the OPD. That evidence, particularly when considered in light of the other evidence showing Hesse's retaliatory intent – e.g., the timing of the change in his attitude toward Mugavero and the evidence that he solicited unfounded complaints against both Mugavero and McArdle – was

sufficient to support an award of punitive damages. The Court cannot conclude that the

jury's decision to award punitive damages was against the weight of the evidence.[27]

###### D. The Punitive Damages Award Will Be Reduced to Comply with the Statutory Cap but Will Otherwise Be Sustained

Title 42 U.S.C. § 1981a limits the amount of compensatory and punitive

damages that may be awarded for Title VII claims based on the size of the "respondent's"

workforce.[28] Arms Acres employed between 200 and 500 employees during 2001 and

2002 (Def. Br. 3; PX 9 at 2), subjecting it to a maximum liability under Title VII of

$200,000. Accordingly, the punitive damages award of $350,000 against Arms Acres

must be reduced to $200,000 in accordance with the statutory cap.[29]

---

[27] In arguing for a new trial, Arms Acres points to evidence supporting its contention that Mugavero made medical errors, including a potentially life-threatening error of judgment in failing to ensure that a suicidal patient was being watched by other staff. (Def. New Trial Br. at 2-6) The issue for the jury, however, was not simply whether Mugavero made errors or violated Arms Acres' policies. Rather, the jury was required to consider the evidence concerning the seriousness of Mugavero's alleged errors along with all of the other evidence in order to determine: (1) whether Defendants would have taken the actions they did due to those errors alone, i.e., would they have taken those actions in the absence of retaliatory motive; and (2) whether Hesse acted with malice or reckless indifference to Plaintiff's federally protected rights. In light of the evidence in Mugavero's favor, the Court cannot conclude that the jury's verdict was a "miscarriage of justice" warranting a new trial. Manley, 337 F.3d at 244.

[28] Section 1981a(b)(3)(C) provides that " the sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party . . . . in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000." 42 U.S.C. § 1981a(b)(3)(C).

[29] "Although the $200,000 damage limit under 42 U.S.C. § 1981a(b)(3)(c) applies to both compensatory and punitive damages, it affect[s] only [Plaintiff's] award for punitive damages because the New York Human Rights Law, which does not allow punitive damages, places no limit on the amount of compensatory damages." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 50 (2d Cir. 1998). Because the total award for compensatory and punitive damages in this case exceeded the statutory cap under federal law, the Court

Plaintiff does not contest the number of Arms Acres employees, but argues – for the first time and in post-trial briefing – that Arms Acres is a wholly owned subsidiary managed, marketed, and operated by Liberty Behavioral Management Group ("Liberty") and thus is part of a single, integrated enterprise with more than 500 employees.  (Pltf. Opp. 7)  Plaintiff's argument has no merit.

### 1. There is No Evidence that Liberty Controls Arms Acres or Was Responsible for Arms Acres' Employment Decisions

As district courts in this circuit have noted, "[Section 1981a] applies to the 'respondent' in the current action, not a theoretical respondent alluded to in post-trial briefs."  Parrish v. Sollecito, 280 F. Supp. 2d 145, 155 (S.D.N.Y. 2003)[30]; see also Greenbaum v. Handelsbanken, 26 F. Supp. 2d 649, 652 (S.D.N.Y. 1998) ("The cap is based on how many employees the 'respondent' has; assuming this word has the same meaning throughout § 1981a, the 'respondent' is the entity against whom the 'action [is] brought by a complaining party.'").  The "respondent" in this case was Arms Acres, not Liberty.  While Plaintiff could have sought to join Liberty as a defendant, she did not do so and she may not now assert its liability after the jury has been released and a verdict entered.  See Parrish, 280 F. Supp. 2d at 156.[31]

---

will "treat [the compensation award] as though awarded" with respect to Mugavero's state law claims and the reduced punitive award as though awarded for her Title VII claims.  Watson v. E.S. Sutton, Inc., No. 02-Civ.-2739(KMW), 2005 WL 2170659, at *15 (S.D.N.Y. Sep. 6, 2005).

[30]  In Parrish, the court held that the fact "[t]hat many of [respondent's] employees were employed by more than one dealership that he owned, or that one billing system was used to pay employees and various dealerships owned by [respondent], does not alter the identity of Parrish's chosen respondent in this case."  Parrish, 280 F. Supp. 2d at 155.

[31]  "[B]ecause the jury has already been dismissed, Fed. R. Civ. P. 49 does not permit Parrish to take further discovery at this time and request that the Court make findings of fact.  Rule 49 allows the Court to make factual findings if it inadvertently omits a

The Second Circuit, however, recognizes that "in appropriate circumstances, an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger 'single-employer' entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer." Arculeo v. On-Site Sales & Mktg., L.L.C., 425 F.3d 193, 198 (2d Cir. 2005). In Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir. 1995), the Second Circuit adopted a four-factor test for determining when – for purposes of Title VII liability – a parent company may be considered the employer of a subsidiary's employees: "'(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'" Cook, 69 F.3d at 1240 (quoting Garcia v. Elf Atochem North America, 28 F.3d 446, 450 (5th Cir. 1994)). The Court noted that inquiry should focus on the second factor and cited a Fifth Circuit opinion holding that the critical question is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" Cook, 69 F.3d at 1240 (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir. 1983)). Here, Plaintiff has offered no evidence that Liberty controls Arms Acres or was responsible for the adverse employment actions taken against Mugavero.

First, despite Plaintiff's post-trial, unsupported assertions, there is no evidence that Arms Acres is a subsidiary of Liberty. Wallace-Moore testified at trial that

---

necessary factual issue in the verdict sheet 'raised by the pleadings or by the evidence' and the parties do not object to that omission. Fed. R. Civ. P. 49(a). In this case, Parrish never raised the issue of a single entity theory until her post-trial motion. She cannot bypass normal proceedings concerning unexplored factual issues, which were not even alleged in the complaint, by delay."

Arms Acres is an incorporated, "stand-alone" entity. (Tr. 1793:8-16) She explained that Liberty is a "management parent company" that manages a number of facilities. (Id.) She did not state, contrary to Plaintiff's argument (Pltf. Damages Br. at 6-7), that Arms Acres and Liberty are one company, that Arms Acres is controlled by Liberty, or that Arms Acres is a wholly-owned subsidiary of Liberty. Nothing before this Court establishes those facts.

To the contrary, Arms Acres has submitted an affidavit from Robert D. Eustis, the Vice President and Clerk of Liberty Management, stating that "Liberty Management and Arms Acres are separate legal corporations and entities. Arms Acres is not a wholly owned subsidiary of Liberty Management." (Eustis Aff. ¶ 1-4) The affidavit further states:

> Arms Acres is a separate legal entity. Arms Acres is not a subsidiary of any corporation. Pursuant to the requirements of New York law, no corporation is permitted to own an alcohol and drug treatment facility, such as Arms Acres. During 2002, the period of time in question, the stock of Arms Acres was owned by two individual shareholders. [The majority shareholder had no] stock ownership interest in Liberty Management Group, Inc. or in Liberty Behavioral [during 2002].

(Eustis Aff. ¶ 4) Finally, Eustis' affidavit states that: (1) "Liberty Management was not involved directly in the daily decisions of Arms Acres" but rather "provided certain marketing and advertising services to Arms Acres"; (2) Arms Acres did not share employees, equipment, inventories, or books with Liberty Management (Id. ¶¶ 10, 11, 12, 13); (3) there was no centralized control of labor relations or human resources (Id. ¶¶14, 15); and, (4) Arms Acres had its own policies and made its own decisions regarding the hiring, discipline, and termination of employees (Id. ¶ 16). Given the absence of any contrary evidence, this affidavit is sufficient to establish that Liberty did not control Arms

Acres or participate in Arms Acres' employment decisions.  See Parrish, 280 F. Supp. 2d at 158 (holding that an affidavit submitted in post-trial briefing was sufficient to establish the size of the employer's workforce for purposes of §1981a).

### 2.    The Punitive Damages Award Does Not Shock the Conscience

Arms Acres next argues that even a reduced punitive damages award of $200,000 is "grossly excessive and shocking to the judicial conscience" (Def. Damages Br. at 5), and that the punitive award should be remitted to no more than $25,000.  (Id. at 7)  As discussed below, given the vindictive and malicious nature of Hesse's conduct, Arms Acres' argument for a reduction below $200,000 will be denied.

In this circuit, the test for determining whether a punitive damages award is excessive, is whether the award "is so high as to shock the judicial conscience and constitute[s] a denial of justice." Mathie v. Fries, 121 F.3d 808, 817 (2d Cir. 1997); see also Casey v. Long Island R.R. Co., 406 F.3d 142, 146-47 (2d Cir. 2005) (applying same standard); EEOC v. Everdry Mktg. & Mgmt., 2009 U.S. App. LEXIS 22488 (2d Cir. N.Y. Oct. 14, 2009) (same).  In considering whether a punitive award is excessive, courts must "bear in mind that the purpose of punitive awards is to punish the wrongdoer and to deter others." Mathie, at 817.  The Supreme Court has identified three "guideposts" for determining whether punitive damages are excessive:  (1) the degree of reprehensibility; (2) the ratio of the harm or potential harm suffered due to the defendant's conduct and the punitive damages awarded; and (3) the difference between the remedy and any civil penalties authorized or imposed in comparable cases.  BMW of North America, Inc. v. Gore, 517 U.S. 559, 574-75 (1996); see also State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003); Philip Morris USA v. Williams, 549 U.S. 346, 353 (2007).

The degree of reprehensibility is "the most important" of the guideposts. State Farm, 538

U.S. at 419 (citing <u>Gore</u>, 517 U.S. at 575).  The Second Circuit has applied <u>Gore</u> broadly: "[t]he Supreme Court's guideposts in <u>Gore</u>, though marking outer constitutional limits, counsel restraint with respect to the size of punitive awards even as to the nonconstitutional standard of excessiveness."  <u>Mathie</u>, at 817.

Here, Arm Acres argues that there is no evidence that Hesse acted with violence, deceit or malice, or engaged in repeated instances of misconduct, and that accordingly his conduct cannot be found reprehensible.  (Def. Damages Br. at 5)  <u>See Lee v. Edwards</u>, 101 F.3d 805, 809 (2d Cir. 1996) (citing <u>Gore</u>, 517 U.S. at 576, and discussing factors considered in determining reprehensibility).  As discussed above, however, the jury could reasonably have found Hesse's conduct malicious, vindictive, and in bad faith.  (<u>See</u> <u>supra</u>, p. 13)  This is enough to establish reprehensibility.  <u>See Quinby v. WestLB AG</u>, 2008 WL 3826695 at *12 (S.D.N.Y. Aug. 15, 2008) (Making reprehensibility finding where "the jury found that Defendant had engaged in multiple instances of retaliation against Plaintiff herself, and . . . Plaintiff arguably established that Defendant acted maliciously . . . when it retaliated against her.  Thus, Defendant's conduct can be described as reprehensible, though it does not fall at the extreme end of the reprehensibility spectrum.");  <u>Zakre v. Norddeutsche Landesbank Girozentrale</u>, 541 F. Supp. 2d 555, 565 (S.D.N.Y. 2008).

The ratio of punitive to compensatory damages here also fails to support Arms Acres' argument.  Courts "need not, and indeed . . . cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. [They] can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus."  <u>BMW</u>, at 582-83

(quoting <u>Txo Prod. Corp. v. Alliance Res. Corp.</u>, 509 U.S. 443, 458 (1993)). "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." Only in "breathtaking" cases, where, for example, the ratio is 500 to 1, is remittitur appropriate. <u>Id.</u> Here, the punitive damages award of $200,000 is a <u>fraction</u> of, not a multiple of, the compensatory award, and accordingly the award does not "cross the line into the area of constitutional impropriety." <u>Pac. Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 23-24 (1991) (upholding punitive award where there was a 4 to 1 ratio of punitive to compensatory damages and the punitive award represented "more than 200 times the out-of-pocket expenses of respondent [] and . . . much in excess of the fine that could be imposed"); <u>Patterson v. Balsamico</u>, 440 F.3d 104, 121 (2d Cir. 2006) (upholding punitive damages award where it was "a relatively small fraction of the compensatory damages, rather than a multiple thereof, and thus [was] not disproportionately large by comparison").

        Comparable cases indicate that a $200,000 punitive damages award is not inappropriate for Hesse's unlawful conduct. In several Title VII cases involving retaliation or intentional discrimination, courts have upheld punitive damages awards exceeding $200,000. <u>See</u> <u>Greenbaum v. Svenska Handelsbanken</u>, 67 F. Supp. 2d 228 (S.D.N.Y. 1999) (imposing a $1.25 million punitive damages award where defendant had repeatedly refused to promote the plaintiff because of her sex, subjected her to a six-year pattern of discrimination, attempted to hide its adverse actions from plaintiff, and eventually terminated her in retaliation for complaining about discrimination); <u>Watson v. E.S. Sutton, Inc</u>., No. 02 Civ. 2739, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005) (remitting a $ 2.5 million punitive damages award to $717,000, or 50% of the

compensatory damages award, where defendant systematically failed to take complaints of sexual misconduct seriously, maliciously terminated plaintiff for complaining of sexual harassment, filed false affidavits in response to her EEOC charge, and falsely accused her of committing a federal crime); Jordan v. Bates Adv. Holdings, Inc., 2006 NY Slip Op 26046, 10 (N.Y. Sup. Ct. 2006) (applying the Title VII framework to state law actions and finding a $500,000 punitive damages award appropriate where defendant harassed plaintiff and eventually terminated her on account of her perceived disability); Quinby, 2008 WL 3826695 (reducing $1.3 million punitive damages award to $750,000 in gender discrimination and retaliation case).

The Court recognizes, however, that "[o]n the issue of excessiveness, comparing punitive damage awards in other cases where employers were found liable for discrimination and/or retaliation, is of limited utility because a wide range of awards have been upheld." Hill v. Airborne Freight Corp., 212 F. Supp. 2d 59, 77 (E.D.N.Y. 2002) (collecting cases upholding punitive awards between $ 10,000 and $ 1.25 million); Norris v. New York City College of Tech., No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009) (citing Hill, 212 F. Supp. at 77, for limited utility of comparing awards in comparable cases). Each case involves a unique set of facts, and accordingly this Court is relying primarily on the egregious facts associated with Hesse's report to the OPD rather than a selective comparison to other cases.[32]

---

[32] Arms Acres has cited a number of cases in support of its argument that a $200,000 award is excessive. (Def. Damages Br. at 6) These cases are factually distinguishable. The court in DiSorbo, 343 F.3d 172, for example, reduced a punitive damages award after looking to the fine applicable under New York law for assault, the civil offense most similar to the police brutality claim at issue in that case. Kim v. Dial Serv. Int'l, No. 96 Civ. 3327, 1997 U.S. Dist. LEXIS 12544, at *49 (S.D.N.Y. Aug. 7, 1997), aff'd, 159

Here, the jury heard evidence that Hesse not only retaliated against Plaintiff by arranging for written warnings and other discipline to be imposed on her at work, but also sought – with the knowledge and apparent approval of Arms Acres' Executive Director – to take away her livelihood by provoking suspension or revocation of her nursing licenses.  In taking this step, Hesse evidenced a level of malice and vindictiveness that fully justifies a punitive damages award, and this Court cannot find that a $200,000 award shocks the conscience or is otherwise improper.

---

F.3d 1347 (2d Cir. 1998), is likewise inapposite.  That unlawful termination and pay disparity case involved a punitive award of $750,000 and a compensatory award of $25,000.  Id. at 47.  The two remaining cases cited by Arms Acres involve retaliatory discharge, but they are distinguishable because of the low degree of reprehensibility at issue.  In Norris v. New York City Coll. Of Tech., 2009 WL 82556, at *7, the court stated that "[e]ven taking the evidence in the light most favorable to Norris, the Court is left with the firm conviction that [the] decision to terminate her after learning of her complaint of discrimination was a transient outburst of pique and frustration."  Here, there was nothing "transient" about Hesse's retaliatory behavior towards Mugavero.  In Fernandez v. N. Shore Orthopedic & Sports Med., P.C., 79 F. Supp. 2d 197, 208 (E.D.N.Y. 2000), the court remitted the punitive award from $100,000 to $50,000 where there was, as in Norris, no evidence that the defendant had engaged in repeated acts of misconduct; no compensatory damages award; and $50,000 was the statutory cap.  Here, there were repeated acts of misconduct, there was a large compensatory damages award, and the Court reduced the punitive award to the statutory cap.

## **CONCLUSION**

For the reasons stated above, Defendants' motion for judgment as a matter of law (Docket No. 105) is DENIED; Defendants' motion for a new trial (Docket No. 108) is DENIED; and Defendants' motion to vacate or reduce the damage awards (Docket No. 110) is GRANTED to the extent that the compensatory damage award for emotional distress is reduced to $175,000, the lost wages award is reduced to $421,656.95, the lost fringe benefits award is reduced to $11,658.22, and the punitive damages award is reduced to $200,000. Defendants' motion to vacate or reduce the damage awards is otherwise DENIED. Defendants' motion for discovery sanctions (Docket No. 112) is GRANTED. The amount of attorneys' fees and costs awarded to Defendants will be the subject of a separate opinion.

Dated: New York, New York
      January 14, 2010

SO ORDERED.

Paul G. Gardephe
United States District Judge